**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANET BRUNERMER and<br>SCOTT BRUNERMER,<br><br>Plaintiffs,<br><br>v.<br><br>BOROUGH OF APOLLO;<br>BUREAU VERITAS NORTH AMERICA, INC.;<br>SCOTT ANDREASSI, individually;<br>CYNTHIA McDERMOTT, individually;<br>MARK TARLE, individually;<br>DEANNA SHUPE, individually;<br>BRENDA TROUP, individually;<br>RICHARD CRAFT, individually;<br>RODNEY SMAY, individually; and<br>GRANT KANISH, individually<br><br>Defendants. | ) | CONSOLIDATED CIVIL ACTION<br>No. 2:21-cv-00740-MRH<br>The Honorable Mark R. Hornak<br><br>This document relates to:<br>No. 2:21-cv-00856-MRH |

**THIRD AMENDED COMPLAINT**

Plaintiffs Janet L. Brunermer and Robert Scott Brunermer, proceeding pro se, file this Third Amended Complaint pursuant to the Court's July 9, 2026 Opinion and Order and allege:

## I. INTRODUCTION AND DEFINITIONS

1. Plaintiffs Janet L. Brunermer and Robert Scott Brunermer own 719 North Warren Avenue, Apollo, Pennsylvania 15613.

2. "Property" means 719 North Warren Avenue and Plaintiffs' rights to possess, use, occupy, exclude, market, and dispose of it, including the right to just compensation for a taking.

3. The separately deeded parcels at 715 and 717 North Warren Avenue were not offered as parking for the proposed use at the Property.

4. "MPAF" means the Municipal Prior Approval Form Apollo and BVNA required. Despite written requests, neither identified enacted authority, decisional standards, a deadline, a denial procedure, or a review route for Apollo's action.

5. "Final written determination" means a code-cited decision identifying the basis, controlling documents, conditions, and review procedure.

6. This action challenges a closed administrative loop, not an unfavorable permit decision. Apollo controlled municipal approval, vacancy status, and the MPAF; BVNA controlled UCC review, classification, inspections, and occupancy; each treated the other's unresolved action as a prerequisite; and neither issued a final, reviewable decision identifying the requirements and compliance path.

7. By withholding approval, denial, and the operative permit record while controlling the route to lawful occupancy, Defendants prevented Plaintiffs from curing, building, obtaining inspection or review, occupying, or selling.

8. On May 7, 2020, Kanish acknowledged that BVNA had Plaintiffs' approved drawings and Pennsylvania accessibility variance and that Apollo's signed MPAF remained outstanding.

9. Before the renewed 2026 process, neither Apollo nor BVNA issued a permit, written denial, final inspection report, certificate of occupancy, or appealable determination. The renewed process produced conflicting permit versions but no complete, internally consistent operative record.

10. After the Court encouraged a renewed process in January 2026, Plaintiffs resubmitted signed application materials, architectural plans, and a code analysis identifying M/F-1. Apollo approved the municipal section, but Defendants changed the plans' lower-level F-1 designation to S-1, produced conflicting permit versions, added an unexplained use-limiting notation, and issued no final inspection report or certificate of occupancy.

11. Plaintiffs seek only their own property-owner injuries. They do not seek SloppySoap Inc.'s damages, revive the dismissed Fourth Amendment-retaliation claim, or invalidate a state-court judgment.

## II. PARTIES AND RELEVANT NONPARTY ACTORS

12. Plaintiff Janet L. Brunermer is an adult Pennsylvania resident and co-owner of the Property.

13. Plaintiff Robert Scott Brunermer is an adult Pennsylvania resident and co-owner of the Property.

14. Defendant Borough of Apollo is a Pennsylvania borough sued under 42 U.S.C. § 1983 for its ordinances, policies, customs, delegations, final-policymaker decisions, ratification, and deliberately indifferent failure to correct challenged practices after notice.

15. Defendant Bureau Veritas North America, Inc. performed Apollo's delegated UCC plan review, permitting, inspection, and Building Code Official functions under color of state law.

16. Defendant Grant Kanish served through BVNA as Apollo's delegated Building Code Official, plan reviewer, inspector, and permit decisionmaker.

17. Defendant Rodney G. Smay served through BVNA as the commercial plan reviewer assigned to Plaintiffs' change-of-occupancy applications.

18. Defendant Brenda Troup served at relevant times as Apollo's Zoning Officer, Code Enforcement Officer, Secretary, and Open Records Officer.

19. Defendant Deanna Shupe served at relevant times as Apollo's Secretary, Treasurer, and Open Records Officer.

20. Defendant Cynthia McDermott served at relevant times as Apollo's Borough Manager.

21. Defendant Richard Craft served as Apollo's contracted engineer through Olsen Craft Associates, LLC, and is sued for the administrative conduct alleged below.

22. Defendant Scott Andreassi served as Apollo's Open Records Officer and Borough Solicitor. He is sued only for non-advocacy administrative acts involving records, MPAF and permit coordination, and property-directed action—not courtroom advocacy, legal filings, or legal advice alone.

23. Jarred Kier served as Apollo's Chief of Police but is not a Defendant. His vacancy-citation conduct and testimony are pleaded only as chronology, notice, motive, custom, ratification, causation, and coordination evidence. Plaintiffs seek no relief from him.

24. Defendant Mark Tarle served as an Apollo councilmember and is sued only for alleged nonlegislative conduct.

25. Jennifer Mullins-Tarle served as an Apollo councilmember but is not a Defendant. Her May 2021 site conduct and later statements are pleaded only as chronology, notice, retaliatory hostility, motive, ratification, causation, and coordination evidence. Plaintiffs seek no relief from her or claim based solely on legislative votes or protected speech.

26. Rick McMillen was a BVNA employee whom Kanish selected for Plaintiffs' proposed vacancy inspection. McMillen is not a Defendant, and his involvement is pleaded only as background, notice, delegation, supervision, motive, custom, and circumstantial coordination evidence.

27. Each individual Defendant acted under color of state law, jointly with state actors, or through authority delegated by Apollo, as alleged below.

28. All individual Defendants are sued solely in their individual capacities.

## III. JURISDICTION, VENUE, AND LIMITATIONS ON RELIEF

29. Jurisdiction exists under 28 U.S.C. §§ 1331 and 1343 because Counts I–VII and IX arise under 42 U.S.C. § 1983 and the Constitution, Count VIII pleads the entity-liability bases applicable to Counts I–V, and supplemental jurisdiction exists over Count X under 28 U.S.C. § 1367.

30. Venue is proper under 28 U.S.C. § 1391(b)(2) because the Property is here and a substantial part of the events occurred in this District.

31. Plaintiffs do not seek to overturn state judgments, reopen the vacancy conviction, invalidate the Declaration of Taking, or obtain duplicate recovery. Final state judgments receive the preclusive effect required by law.

32. Plaintiffs seek relief only for independent acts and injuries not requiring rejection of a state-court judgment, subject to 28 U.S.C. § 1738, preclusion law, and required credits.

33. Damages rest on the discrete acts identified in each Count. Earlier events are actionable only if timely, preserved, tolled, or otherwise permitted; otherwise they are pleaded as background, notice, motive, custom, causation, or context. Continuing consequences alone do not restart limitations.

34. Conduct by nondefendants is pleaded only as background, notice, motive, municipal-policy, ratification, causation, or circumstantial coordination evidence. Plaintiffs seek no relief against anyone not named in the caption and the applicable Count.

## IV. FACTUAL ALLEGATIONS

### A. Acquisition, Transfer Certificate, and Initial UCC Referral

35. Plaintiffs purchased the Property on April 6, 2017, intending to renovate the former church for small-scale artisanal soap production and retail sales.

36. On April 5, 2017, Apollo issued Certificate of Use No. 040517-1. The Certificate identified "Permitted Use: Commercial," stated that the structure had been inspected and found compliant with the 2009 International Property Maintenance Code, and stated, "Temporary Occupancy Permit Issued: Yes." Its handwritten comment directed Plaintiffs to BVNA because the intended use would require a separate UCC change-of-occupancy permit. (ECF No. 120-6 at 1.)

37. The April 5 Certificate identified no violation, corrective work, expiration date, parking deficiency, land-development requirement, or other condition under Apollo's transfer and property-maintenance inspection process. Apollo issued no separate municipal inspection report identifying any such deficiency.

38. Plaintiffs do not allege that the April 5 Certificate was a final UCC certificate of occupancy or that it resolved every zoning question concerning the precise proposed retail and soap-production configuration. The Certificate shows that Apollo completed its local transfer inspection, recognized the Property's permitted use broadly as commercial, found compliance with the identified local property-maintenance code, and referred the separate UCC change-of-occupancy determination to BVNA.

39. During the April 5 inspection, before BVNA received a completed permit application or issued a written deficiency, Kanish stated before the seller's representative: "Why am I here—this building isn't going to pass inspection anyway."

40. On April 19, 2017, Borough Manager McDermott directed Janet Brunermer to contact BVNA concerning the permits and approvals required for Plaintiffs' intended use.

41. Plaintiffs then sought from Apollo and BVNA the materials, standards, inspections, and approvals required for lawful commercial occupancy.

42. Apollo and BVNA administered distinct governmental functions. Apollo controlled zoning determinations, vacancy enforcement, action on the MPAF, and related Borough records. BVNA and Kanish, acting through Apollo's delegated UCC enforcement structure, controlled UCC plan review, occupancy classification, reviewed construction documents, permit disposition, inspections, and issuance of a certificate of occupancy. A valid municipal approval could operate as a prerequisite to UCC permit action, but neither entity supplied a complete statement identifying the required

approvals, applicable standards, deficiencies, responsible decisionmaker, disposition, and review procedure. Instead, each treated the other's unresolved action as preventing finality.

**B. Vacancy Designation, Inspection Pressure, and Enforcement**

43. On January 18, 2018, Borough Manager Cynthia McDermott identified the Property as a "vacant structure," scheduled an inspection, and warned of administrative, inspection, and registration fees if a waiver were denied.

44. Ordinance 272-16 deemed a building vacant when no person conducted a lawfully licensed business or lawfully resided there, referenced more than sixty days of nonoccupancy, and listed foreclosure, bankruptcy, and tax-sale conditions. (ECF No. 67-2 at 3–4.)

45. Ordinance 271-16 separately governed use-and-occupancy and property-transfer procedures. It required a reasoned violation notice, corrective action, and a reasonable cure period; Apollo issued no such notice or inspection report. (ECF No. 48-2 at 3, 5.)

46. Ordinance 272-16 separately defined "Vacant," "Vacant Building," and a sixty-day period, but did not explain whether Ordinance 271-16's transfer-and-cure process came first, suspended vacancy time, or barred vacancy treatment caused by unresolved governmental approval. (ECF No. 67-2 at 3–5.)

47. Apollo did not reconcile the ordinances. It issued the April 2017 certificate without identifying violations or corrective work, then imposed vacancy status because no lawful business operated, although Apollo and BVNA had not completed the approvals required for operation.

48. The Municipal Code and Ordinance Compliance Act allowed twelve months to correct covered violations identified through a transfer inspection and temporary certificate. 68 P.S. §§ 1082.1(a), 1083(a), (a.1). The conflicting, undisclosed timelines are pleaded as notice and process defects, not a freestanding federal claim.

49. McDermott's January 18 letter did not identify the governing ordinance provision, evidence supporting vacancy, waiver requirements, or a procedure to challenge or end the designation.

50. McDermott did not answer Janet's vacancy questions and repeatedly referred her to Kanish, although Kanish performed delegated UCC functions and Apollo controlled vacancy classification and enforcement. Plaintiffs were left without an identified Borough decisionmaker for their municipal challenge.

51. Plaintiffs promptly disputed the designation before Council. When they asked why the Property was vacant and identified another apparently inactive property, a Borough representative responded, "We'll determine who's vacant."

52. Plaintiffs requested the ordinance, criteria, inspection standards, evidence, waiver requirements, and comparator information, and submitted a Borough form stating: "NO VACANT PROPERTY OWNED."

53. Around June 30, 2018, Apollo provided a registration packet identifying Ordinances 267-15 and 272-16 as governing and warned that nonresponse could be referred to police.

54. On July 3, 2018, Plaintiffs' counsel Craig Maravich went to the Borough Manager's office for Ordinances 267-15 and 272-16. Staff initially said copies would be sent later and payment required by check. After he insisted on reviewing them, staff provided copies for cash, which Maravich sent to Plaintiffs on July 5.

55. The ordinances showed that 272-16 purported to amend 267-15 in its entirety and repeal inconsistent provisions, raising why Apollo relied on both and which standards governed the Property.

56. On July 11, 2018, Maravich sent McDermott a written challenge disputing the vacancy designation and reliance on both ordinances. He requested the supporting evidence, controlling

provision, alleged violation, cure, fees, comparators, and waiver procedure. McDermott issued no substantive determination resolving those issues. (Ex. 1 at 1–4).

57. On July 25, 2018, Borough Solicitor Miller stated that he was gathering the information necessary to respond.

58. Around July 31, 2018, Apollo caused summary citations to issue against both Plaintiffs under Ordinance 272-16 § 4(a). They were filed August 7 while the written challenge remained unresolved. On August 21, McDermott wrote that Troup asked Kier about the hearing before he filed the citations and that "he wrote it after her inquiry" (Ex. 1 at 6–7).

59. When Solicitor Miller requested the vacancy basis, Troup cited no operating business, customers, signage, or interior inspection and admitted Apollo had "no clue" what occurred inside (Ex. 1 at 5). McDermott relied on nonoccupancy and missed inspections but said Troup likely would have granted waivers because Plaintiffs had done "an awesome job of renovating" (Ex. 1 at 6). Apollo also relied on internet searches, exterior observations, and speculation without tying them to ordinance criteria.

60. On October 2, 2018, Miller said the Property would cease being vacant once Plaintiffs conducted business, while Apollo still required a vacancy inspection before granting a waiver.

61. On October 8, 2018, Kanish said BVNA required stamped drawings, a permit application, an MPAF, and Apollo approval, but Apollo would not approve before a vacancy inspection.

62. On October 16, 2018, Miller tied the proposed vacancy inspection to Plaintiffs' rescheduled vacancy-citation hearing.

63. On October 29, 2018, Troup told McDermott that Plaintiffs did not "really have a business" because BVNA had not completed the change of occupancy, that Janet was not living at the Property, and that no vacancy waiver could issue even if an inspection occurred; McDermott replied that Plaintiffs had "really complicated a simple procedure for vacant properties in Apollo" (Ex. 2 at 1).

64. Apollo acknowledged no written contract with Troup; she invoiced the Borough at $15 per hour for vacancy work. Troup confirmed the arrangement, said she had received the same rate since 2012, added, "This is getting personal," and later testified she was an independent contractor without a written contract. The arrangement and statement are pleaded as evidence of informal delegation and motive, not that hourly pay alone created unconstitutional bias.

65. From June 10–12, 2019, Troup and Clerk Jamie Johnston discussed using water consumption to identify vacancy. Johnston saw no ordinance reference to low usage; Troup told her to "just stick with zero usage."

66. At the June 24, 2019, summary-appeal proceeding, Kier testified that the citation followed Plaintiffs' failure to undergo the inspection and that he had been told to cite Janet Brunermer.

67. Troup testified that Apollo used the inspection both to determine vacancy and decide a waiver, and treated the Property as assembly or church use because the change of occupancy remained incomplete.

68. Troup further testified that Apollo had no formal method or written list for tracking newly suspected vacant properties and instead relied on officials' knowledge and, in some cases, water-usage reports. (Ex. 12, Troup Dep. 31:10–33:13).

69. On April 6, 2023, Apollo offered only to suspend vacancy enforcement for a "reasonable period" while Plaintiffs pursued occupancy approval; it did not permanently terminate the Property's vacancy status.

70. Apollo and BVNA maintained a closed loop: lawful business would end vacancy; lawful operation required BVNA's change-of-occupancy process; BVNA required Apollo's MPAF approval; Apollo conditioned that approval on the disputed vacancy process; and Troup said no waiver could issue because BVNA had not completed the change of occupancy. No actor issued the final decision needed to permit compliance or review.

**C. MPAF Gatekeeping and the Extra-Statutory Veto**

71. By 2019, Apollo and BVNA treated Apollo's MPAF signature as a prerequisite to BVNA's commercial change-of-occupancy permit, without identifying enacted authority, standards, or a municipal decision deadline.

72. The then-applicable commercial UCC process required the building code official to grant or deny an application within the prescribed period, give written code-cited reasons for denial, return approved construction documents, conduct required inspections, and issue a certificate of occupancy upon compliance. 35 P.S. § 7210.502(a); 34 Pa. Code §§ 403.43, 403.46.

73. Plaintiffs do not dispute valid municipal prerequisites. They allege that Apollo and BVNA used the MPAF to withhold permit action without identifying or deciding the unmet requirement.

74. On February 25, 2019, Troup told Kanish that Plaintiffs were "being difficult," Janet "hates me" and "hates everyone in the borough," and referenced a dispute involving her nearby pet store. She supplied use, water, sale, occupancy, and inspection allegations, identified Kier as corroboration, forwarded the vacancy form, and said Andreassi would contact Kanish after the Property had already been deemed vacant and fee-subject.

75. Before those statements, Janet repeatedly tried to contact Troup about the Property and required approvals by phone, email, and an in-person visit to The Fish Bowl Too. Troup did not respond and avoided speaking with Janet during the visit by leaving the customer area for the restroom.

76. Janet and Troup otherwise had no substantive Property discussion before Troup's statements to Kanish. The sequence shows Troup knew Janet was seeking municipal guidance before supplying adverse information.

77. Apollo later said it used one vacancy-inspection checklist but produced different 2018 and 2019 versions, including Troup's form, while earlier requested versions remained unproduced.

78. On February 26, 2019, Plaintiffs submitted a signed Apollo "Application for Zoning or Building Permit" seeking commercial use as a retail storefront and artisanal-soap facility, together with a BVNA application, an unsigned MPAF, a direction form, and payment. (Ex. 3 at 1–5).

79. On March 20, 2019, Andreassi acknowledged the application, stated that the proposed use appeared permitted subject to changing the assembly use, and directed Plaintiffs to BVNA and a vacancy inspection, copying Troup, Shupe, and BVNA; Apollo neither approved nor denied the application. (Ex. 3 at 5–6).

80. Apollo did not require another application until January 2026. Meanwhile, Apollo and BVNA continued treating the unsigned MPAF as the barrier to permit issuance.

81. On March 30, 2019, McMillen contacted Janet to arrange the proposed inspection but did not initially identify his employer, authority, or the inspection's purpose. Janet directed him to Plaintiffs' counsel and questioned his qualifications. At the April 9 meeting, Kanish stated that BVNA would not consider Plaintiffs' applications until Apollo approved them, and that Apollo would not provide approval until Plaintiffs submitted to a vacancy inspection; Oresick reported that the other attendees agreed on that point (Ex. 11 at 2).

82. At the same meeting, Troup stated that Apollo would continue treating Plaintiffs as noncompliant and would refuse occupancy and change-of-use approval even if Janet were acquitted of the vacancy charge (Ex. 11 at 2). Troup also stated that Apollo could impose additional parking requirements irrespective of the intended use, while Plaintiffs' counsel stated that the Property might be exempt under Article 14 (Ex. 11 at 2).

83. On August 14, 2019, Kanish returned Plaintiffs' application and $90 check, listing the unsigned MPAF, drawings, checklist, occupancy certificate, construction date, and policy materials, but issued no final denial, appeal notice, or approved or denied MPAF. (ECF No. 48-5 at 1.)

84. On August 19, 2019, Plaintiffs disputed the deficiencies and again requested the MPAF and definitive requirements (ECF No. 67-8 at 1–7; ECF No. 68-2 at 1). On September 17, Andreassi forwarded their fifth MPAF request to Kanish, asking whether they sought “through the back door” what they could not obtain through Apollo (Ex. 5 at 5–6). In Apollo’s August 22, 2019, response, Andreassi stated that Apollo possessed no occupancy permit or DLI file number for the Property and was not aware that the requested historical occupancy information had been provided (Ex. 4 at 4). These admissions show Defendants required historical government records Apollo did not possess while neither entity issued a final decision resolving the deficiency.

85. On December 3, 2019, Kanish stated to Andreassi that BVNA would begin UCC permitting and inspection only after Plaintiffs completed Apollo’s unresolved occupancy and vacancy process. (Ex. 5 at 1.)

86. On January 28, 2020, Kanish told Andreassi that BVNA’s local office did not possess McMillen’s requested CV or résumé, that Kanish had hired him because he knew his background, and that McMillen “would have had to” submit a résumé through BVNA’s hiring website; the response supplied no certification, appointment, training record, or other documented qualification for McMillen’s proposed Apollo inspection work. (Ex. 5 at 3).

87. In the same response, Kanish stated that Plaintiffs were “always asking for documents,” proposed going on “Offense” through citations, and suggested that citations might make the matter “go away”; the next day, after Kanish complained of Plaintiffs’ “stupid questions,” Andreassi replied, “Can’t blame you my friend.” (Ex. 5 at 3–4).

88. On February 6–7, 2020, Plaintiffs told Craft that no off-street parking or loading was required under their reading of Article 14, Table I, that the Property lay in the Business Transition District with a Town Center Overlay, and that the adjoining parcels were separately deeded; at Craft’s request,

they supplied a sketch of the existing parking configuration (Ex. 6 at 1–4, 6). Craft ultimately stated that no formal land-development plan was required for the proposed work (Ex. 6 at 7).

89. Craft told Shupe and Troup that Plaintiffs had "sufficiently addressed the parking issues," that no land-development plan was required, and that Kanish could still "give them grief" over accessible parking; Troup replied, "I'll sign it now" (Ex. 6 at 6). Craft later stated that he needed no additional information (Ex. 6 at 7). Apollo nevertheless provided neither a signed MPAF nor a written denial.

90. On February 24, 2020, Kanish stated that Apollo had not signed the MPAF and that Plaintiffs' three BVNA applications had been denied as incomplete (Ex. 6 at 9).

91. The February 7 and February 24 communications left unexplained why Apollo's signoff remained absent after Craft had concluded that parking was sufficiently addressed, no land-development plan was required, and Troup could note zoning compliance, and after Troup responded, "I'll sign it now." Neither Apollo nor BVNA identified an intervening zoning determination, newly discovered deficiency, withdrawal of Troup's stated position, or written reason why the promised signoff had not occurred.

92. On March 30, 2020, Troup acknowledged that the proposed uses were permitted but requested square-footage allocations and a scaled parking diagram. Apollo issued no written determination explaining whether those requests altered, supplemented, superseded, or withdrew Troup's February 7 statement that she would sign, and BVNA continued requiring Apollo's MPAF approval.

93. Plaintiffs repeatedly requested that Apollo sign or deny the MPAF and identify any remaining municipal requirement. Apollo issued no signature, written denial, final zoning determination, or identified review route; BVNA issued no final permit decision. No final document identified whether the remaining obstacle was vacancy, zoning, use classification, parking, land development, a UCC deficiency, or Apollo's refusal to complete the MPAF.

**D. Technical Plan Review, Accessibility Variance, and Remaining Municipal Signoff**

94. Plaintiffs retained architect David Lowry, who revised the drawings, answered BVNA's review, supplied accessibility information, and sought state relief for the ramp.

95. On May 2, 2020, DLI issued Accessibility Variance No. 538879, allowing the existing ramp condition. The variance noted that no parking area or loading zone was proposed and therefore did not decide parking or loading questions. (ECF No. 208-1 at 1–2.)

96. During the 2020 plan review, Smay required Plaintiffs to seek a state accessibility variance concerning the existing front entrance ramp and landings, although those features predated Plaintiffs' ownership and were not proposed for construction or alteration. Plaintiffs' architect advised Smay that the entrance was functional, that full enlargement was technically infeasible because of the limited site, and that the alteration-cost limitation also applied. Smay declined to accept the existing condition and directed Plaintiffs to petition the Pennsylvania Accessibility Advisory Board.

97. On March 31, 2020, DLI official Joseph Martin told Plaintiffs and their architect that he did not understand why the variance had been required because the ramp predated Plaintiffs' ownership and should remain as an existing condition. On May 2, 2020, DLI granted the variance and authorized use of the existing access. Smay's March 16, 2020, plan-review report stated that Apollo's signed MPAF and approval of the pending variance were the remaining items and that, if obtained, the permit was "ok to issue."

98. On May 7, 2020, Kanish stated that BVNA possessed Plaintiffs' approved drawings and DLI accessibility variance and that Apollo's signed MPAF was the "last piece of the puzzle" before permitting and inspections; he identified no other remaining item. (Ex. 7 at 11–14).

99. Plaintiffs delivered BVNA a $200 permit check that day. Kanish said the fee was processed, but BVNA never presented the check and retained it for about six years while the permit remained unresolved.

100. Apollo neither signed nor denied the MPAF or identified review; BVNA neither issued a permit nor a code-cited denial or appeal route.

101. On May 8, Plaintiffs' counsel requested the permit status and remaining actions. Kanish identified no additional technical deficiency or decision date and referred questions to Andreassi.

102. On June 3, Craft said he had reviewed prior MPAFs but could not obtain the attachments from Apollo and asked Plaintiffs to resubmit. Plaintiffs submitted another MPAF and supporting materials on June 18.

103. On August 31, 2020, Plaintiffs submitted another signed MPAF identifying Mercantile use, 2,850 square feet, and $10,000 in construction, with plot-plan and insurance information (Ex. 7 at 15). Apollo's comparison MPAF for 809 North Warren showed municipal approval dated March 10, 2020 (Ex. 7 at 16). The signature Kanish called the "last piece" remained missing, and neither entity stated the legal basis, remaining conditions, or review procedure.

104. In September 2020, DLI stated that the UCC did not specifically mention a "Municipal Prior Approval Form," that the form was not a DLI form, and that it might pertain to one or more municipalities' requirements (Ex. 7 at 7–9). Apollo later said the form belonged to BVNA, but neither Defendant identified municipal authority, standards, a deadline, or review of nonaction.

105. Apollo's unresolved signoff—not parking or an identified UCC deficiency—blocked permitted work, inspection, occupancy, and disposition without a final, code-cited decision.

**E. RTKL, Record Suppression, and Ordinance 271-16**

106. Beginning in 2019, Plaintiffs used RTKL requests to seek ordinances, permits, inspection records, MPAF authority, occupancy standards, vacancy records, and appeal procedures.

107. On August 22, 2019, Andreassi said Troup conducted Borough vacancy inspections, BVNA handled occupancy under contract, and Apollo had no occupancy permit or DLI file number for the Property. He also acknowledged no vacancy-registration, inspection, waiver, payment, or police-

summons records for Shiloh and no vacancy inspection. These admissions show Apollo's allocation of authority, incomplete records, and different vacancy treatment of the same Property under its prior owner (Ex. 4 at 1–4).

108. At the January 15, 2020, mandamus hearing, Kanish testified that he and Andreassi had discussed how the dispute could be "rectified" under the Borough ordinance and State Building Code (ECF No. 67-7 at 22:7–13, 23:16–19). Their January 28–29, 2020 exchanges are alleged in paragraphs 86–87.

109. Apollo's January 2020 court-ordered production included its UCC adoption ordinance, Armstrong UCC Group materials, and municipal election form naming Kanish as Building Code Official. The records confirmed Apollo administered the UCC through officials or a retained agency and used an established appeal board. Yet Plaintiffs received no complete UCC disposition identifying the permit, approved documents, deficiencies, or appealable decision.

110. Ordinance 271-16 was among the governing municipal records Plaintiffs sought through their RTKL requests.

111. Kanish attested in August 2020 that a thorough search found no responsive emails or paper records, but later testified he printed the emails, delivered a stack to Apollo, and did not know what happened to them or why Andreassi said none existed.

112. Troup testified in March 2021 that she routinely deleted Borough emails, did not know of a retention policy, and told Andreassi and Shupe before her affidavit that many emails were deleted. This pleads municipal notice of unstable preservation and collection, not a separate deletion claim.

113. On August 30, 2021, BVNA filed Ordinance 271-16 in this action at ECF No. 48-2, and Apollo filed the same Ordinance at ECF No. 53-4. (ECF Nos. 48-2 at 1–7; 53-4 at 1–7.)

114. On September 8, 2021, after an Andreassi-requested search of Borough records, emails, archives, prior RTKL responses, litigation materials, testimony, and files, Shupe attested that no other

ordinance or Borough code related to change of use existed and no additional responsive documents were held. (Ex. 4 at 7–13.)

115. In October 2021, Apollo claimed it could not identify change-of-use requirements because Plaintiffs had never disclosed existing and proposed uses, contradicting Andreassi's March 2019 letter. The filing called Plaintiffs' records activity and litigation a "vendetta," "harassment," and "intimidation," and acknowledged testimony that Borough records were "a mess."

116. Ordinance 271-16 governed occupancy certificates, transfer inspections, compliance, violation notices, corrective action, and changed use. Shupe's no-record attestation was allegedly incomplete because Apollo and BVNA had filed that Ordinance less than two weeks earlier; later searches found more responsive emails and contractor records.

117. On September 2, 2020, while Plaintiffs' permit disputes, RTKL requests, and related litigation remained active, Plaintiffs attempted to schedule an appointment at the Borough office to review papers after the office signage and Borough website instructed visitors to call for an appointment. Councilmember Mark Tarle responded from his Apollo Council email account that Plaintiffs first had to submit a written request identifying who would attend and what they sought; that any appointment would be scheduled when convenient for whoever Apollo determined needed to be present; that the appointment would be subject to a time limit; and that councilmembers might attend. Tarle stated that no meeting would occur the following morning because Plaintiffs had not submitted a written request and directed any objection to Apollo's attorney.

118. When Plaintiffs asked for the attorney's identity and contact information, Tarle identified Scott Andreassi of Charlton Law Offices. Plaintiffs do not allege that identifying counsel or implementing a neutral appointment procedure alone violated the Constitution. They allege that Tarle's personal imposition of access conditions, his direction of disputes into the Andreassi-controlled channel, and Andreassi's broader administrative role concerning records, municipal

applications, vacancy status, and MPAF processing support an inference that Tarle knowingly participated in the coordinated municipal response to Plaintiffs' efforts to obtain records and definitive governmental action.

119. The RTKL allegations show petitioning, notice, administrative participation, and record reliability. Plaintiffs seek no RTKL penalties or review of an OOR or Pennsylvania-court decision.

120. Troup testified that she did not know who Apollo's Open Records Officer was, had not seen or been trained on a Borough records-retention policy, and kept active Borough work records in her personal possession and home office until the matter closed, when she turned them over to Apollo (Ex. 12, Troup Dep. 7:19–9:4).

121. Troup testified that she helped gather information for Andreassi's August 22, 2019, response (Ex. 12, Troup Dep. 10:19–11:11). As to the 723 North Warren request addressed in that response, she testified that she reviewed the records and offered them to Apollo's solicitor (Ex. 12, Troup Dep. 16:13–17:12).

122. Troup testified that, to her knowledge, the hearing exhibits and attachments to Andreassi's August 22 response were all records Apollo had provided concerning 719 North Warren (Ex. 12, Troup Dep. 19:13–21:9).

123. Troup testified that Apollo had no independent local change-of-use requirements: "The requirements are what Veritas's requirements are for UCC compliance. That is all" (Ex. 12, Troup Dep. 47:3–7).

124. Troup testified that she had seen the April 5, 2017, certificate on Kanish's phone, that she and Kanish discussed some RTKL requests to determine whether additional information existed, and that she did not ask him for the certificate (Ex. 12, Troup Dep. 51:7–52:8).

125. In the OOR and ensuing mandamus proceedings, Apollo was required to conduct a reasonable, good-faith search, including reasonable efforts to retrieve responsive records from third-party

contractors and to identify the sources contacted. The adjudicatory record separately identified Troup's deposition and an "Andreassi 0589 response Gmail account record" as exhibits.

126. Plaintiffs do not infer from the Andreassi source designation alone that Andreassi authored every communication or that each message originated on his computer. The common production source, his direct role in collecting and answering requests, and his continuing MPAF and permit coordination support an inference, subject to discovery, that he occupied a central administrative and records-control role.

127. The sworn testimony and later productions show that decisional information existed across Troup's home office, Apollo's files, BVNA and Kanish's records, and Andreassi-associated sources. The continuing public ambiguity was therefore not adequately explained by an absence of internal information.

128. The same internal-record structure connects the MPAF sequence. Craft removed the parking and land-development obstacle and stated that he required nothing further; Troup stated that she would sign; Shupe was the Borough official routing the MPAF issue to Craft and Troup; yet the signature did not reach BVNA, and Kanish continued treating its absence as the permit barrier without any intervening written determination.

129. Apollo and BVNA possessed enough information to block use of the Property but did not assemble that information into a final determination Plaintiffs could understand and appeal. Plaintiffs allege that the fragmented record was not merely an administrative inconvenience; it enabled Defendants to impose, preserve, and revive conditions without fixing one definitive position.

130. Plaintiffs plead this testimony and the OOR history as evidence of knowledge, custody, coordination, motive, custom, causation, and record reliability. They do not assert an independent federal RTKL claim, seek RTKL penalties, or ask this Court to review an OOR or Pennsylvania-court decision.

**F. Private Criminal Complaints and Petitioning Activity**

131. On December 23, 2020, Plaintiffs filed private criminal complaints under Pa. R. Crim. P. 506 against Kier, Troup, McDermott, and Shupe for alleged false statements, obstruction, intimidation, and misconduct concerning records and vacancy enforcement. The District Attorney disapproved them on January 14, 2021, and the disapprovals survived state-court review.

132. The private complaints are pleaded only as protected petitioning, notice, chronology, motive, and causation. Plaintiffs seek no prosecution, review of prosecutorial discretion, reversal, or criminal finding.

**G. Function-Specific Comparator Treatment**

133. Each property is pleaded only as a comparator for a specific function, official, and decision—not as identical in every respect. Parker and Earthbound concern BVNA and Kanish's UCC functions, not Apollo zoning or vacancy rules.

134. Olsen Craft's report identified unresolved accessibility, restroom, egress, railing, fire-escape, and related work at 809 North Warren Avenue (Ex. 8 at 2–11). Shupe signed Apollo's MPAF on March 10, 2020; BVNA issued Permit No. BVA20-025 on March 11; and BVNA issued a temporary certificate of occupancy subject to completion of listed work (Ex. 8 at 16–20). Plaintiffs' contemporaneous application received neither MPAF action nor temporary occupancy.

135. The 439 Washington Street project in Parker is a limited comparator for BVNA and Kanish's change-of-use, classification, inspection, and final-occupancy functions. BVNA converted a former church into Holy Sundae under Permit No. A20-021 and Project No. 2020-401156, identified A-2 and R-3 occupancies, recorded a final inspection on April 26, 2021, and issued a Kanish-signed Certificate of Occupancy on April 29. It received one identifiable permit, classifications, inspection, and final occupancy decision.

136. Earthbound Apothecary in Kittanning is a limited comparator for BVNA and Kanish's handling of an operating business in a former church before change-of-occupancy permitting. On May 16, 2022, Kanish acknowledged Earthbound occupied the church without a UCC change-of-use or occupancy permit. He did not order closure; he gave the owner ten days to contact BVNA and begin compliance if required. Earthbound continued in-store activity. By contrast, BVNA and Kanish barred Plaintiffs' operation pending Apollo approval while issuing neither a permit nor code-cited denial.

137. Shiloh Baptist Church is similarly situated for Apollo's vacancy enforcement because it owned the same structure immediately before Plaintiffs under the same regime and overlapping officials. Apollo's records showed no completed inspection, findings, registration or waiver payment, or police summons for Shiloh. Plaintiffs received immediate designation, inspection demands, escalating charges, police involvement, and citations.

138. Davis Lawnmower Repair is a limited comparator for Kanish, McDermott, and Troup's response to suspected unpermitted commercial use. They resolved it through inquiry and clarification, not an MPAF impasse, citation, prolonged enforcement, or unresolved decision.

139. The Persoskie property at 723 North Warren is a limited vacancy comparator. Plaintiffs told McDermott the owner died in 2014 and the property appeared unoccupied, but known records show no immediate designation, inspection demands, escalating fees, police referral, or citations like those imposed on Plaintiffs.

140. The adjacent commercial property at 725 North Warren is a limited comparator for Apollo's transfer, occupancy, inspection, UCC, enforcement, records, and recusal functions and evidence of Troup's conflict. Brenda and Dean Troup conveyed it to themselves as living-trust trustees in January 2022, leaving Troup a legal interest while she served as Zoning Officer. On April 22, 2026, Troup signed Apollo's RTKL response reporting no responsive transfer, occupancy, inspection, UCC, plan-

review, enforcement, recusal, or reassignment records beyond landlord registration. Apollo identified no recusal or substitute official. Plaintiffs do not allege every requested record was required or that the trust transfer triggered arm's-length-transfer rules.

141. Known records show no functionally relevant distinction explaining why 809 North Warren received immediate MPAF approval and temporary occupancy; Parker received an identifiable permit and final occupancy certificate; Earthbound continued operating during compliance; Davis received informal resolution; Shiloh and Persoskie avoided immediate enforcement; and 725 North Warren had no documented regulatory or recusal record while Troup retained an interest. Plaintiffs instead received a pre-operation bar, an unsigned and undenied MPAF, inconsistent classifications, continuing vacancy consequences, and no final, code-cited disposition.

**H. Parking, Ordinance 291-22, and Continued Nonfinality**

142. Plaintiffs maintained that Article 14, Table I excepted the Town Center Overlay District from minimum off-street parking; Craft found parking addressed and no land-development plan necessary; and Kanish identified the unsigned MPAF—not parking—as the remaining item. Apollo later reopened parking without a decision.

143. At a March 22, 2022, meeting, Plaintiffs asked Apollo's counsel what "excepting" meant in Article 14. He responded, "Am I on a quiz show?" Plaintiffs then identified the TCO exception and explained that the Property lay within it.

144. Any ambiguity in the parking restriction had to be construed for the owner and against an implied restriction. 53 P.S. § 10603.1. Apollo neither accepted nor rejected Plaintiffs' interpretation before Ordinance 291-22 removed the exception.

145. Apollo issued no decision on the pre-amendment language. On November 22, 2022, while the application remained unresolved, Council enacted Ordinance 291-22 and removed the TCO exception. Plaintiffs seek no individual liability based only on legislative action.

146. After the March 2022 meeting, Troup signed the MPAF. Plaintiffs' renewed submission identified approximately 2,800 square feet of light manufacturing and approximately 50 square feet of retail space with an accessible service counter. Plaintiffs allege that the reduced retail allocation was an effort to obtain approval, not an abandonment of retail use. No Defendant identified any lawful withdrawal, modification, or revocation of Apollo's signed municipal approval. Apollo's execution of the MPAF therefore removed the previously asserted absence of municipal signoff as an explanation for BVNA's continued nonaction. The process nevertheless shifted to additional parking, accessibility, use-allocation, site, and drawing demands without a stable permit disposition or identified route for review.

147. On April 6, 2023, Apollo's counsel offered to waive parking for Plaintiffs' "pre-amendment application," stating it would set no precedent. BVNA's counsel said the waiver did not "cure all of the defects" but identified none. Kanish wrote on April 28 that he saw "light at the end of the tunnel," yet before 2026 no complete permit disposition or deficiency notice followed.

148. Smay again reviewed the project in 2022 and raised parking, accessibility, use-allocation, service-counter, and construction-cost items. After Apollo waived parking, BVNA stated on June 27, 2023, that Smay had signed off on the requested drawing revisions and that no further drawing action was necessary. No final permit disposition followed before 2026.

149. At the September 7, 2023, status conference, Apollo's counsel said there was "no problem" with the commercial space and "the rub always seems to come with these parking spaces." Apollo still issued no final zoning decision, and BVNA issued no final permit decision based on an identified parking rule.

150. During the relevant period, Troup operated or was identified with Fish Bowl Too at 725 North Warren Avenue while exercising Apollo zoning, vacancy, municipal-approval, enforcement, and

records authority over Plaintiffs' adjacent Property. A public web listing for Fish Bowl Too promoted "quick and easy parking just around the corner."

151. Plaintiffs personally observed Troup directing Fish Bowl Too customers to use Plaintiffs' separately deeded parking area. Troup later told Council that Plaintiffs' fence hindered box-truck deliveries and vehicle circulation serving her business. Plaintiffs allege that keeping 719 North Warren commercially inactive and preserving access to Plaintiffs' parking and circulation area provided concrete customer-parking, delivery, and vehicle-maneuvering advantages to Troup's neighboring business.

152. Defendants repeatedly substituted or revived barriers rather than issue a final decision. By May 2020, Craft had concluded that parking was sufficiently addressed and no land-development plan was required; DLI had granted the requested accessibility variance; and Kanish acknowledged that BVNA possessed approved drawings and identified Apollo's signed MPAF as the "last piece of the puzzle."

153. In 2023, Apollo waived parking for Plaintiffs' pre-amendment application; BVNA later stated that no further action was necessary concerning the approved drawing revisions and identified application-date, municipal-signature-date, and fee matters; and Apollo's counsel admitted there was "no problem" with the proposed commercial space and that parking remained "the rub."

154. No final permit disposition followed. In 2026, after Apollo approved Plaintiffs' renewed M/F-1 submission, BVNA changed F-1 to S-1, generated competing permit versions, and maintained the unreconciled record after notice.

**I. Condemnation Coordination and Formal Taking**

155. On October 13, 2023, Apollo's counsel sent a proposed ordinance condemning the Cunningham Lane strip and said eminent domain might be used "as part of that mix" while occupancy

negotiations continued; Andreassi was copied. The communication is pleaded as notice, timing, and policy evidence, not a claim against counsel for advocacy.

156. On October 23, 2023, appraiser James Keffalas conducted an exterior-only viewing. After Council passed the ordinance, Apollo's counsel said the Declaration of Taking would be filed the next week and requested an interior viewing; Andreassi was copied.

157. On October 26, Plaintiffs told counsel they would allow an interior inspection but were unavailable until the week of November 14. Apollo filed the Declaration on November 1, and Keffalas issued his report November 13 without an interior inspection. These facts show Plaintiffs did not refuse access and Apollo valued the Property from an exterior-only observation despite their offer of later access.

158. On November 1, 2023, Apollo filed a Declaration of Taking for two acquisition areas totaling approximately 479.5 square feet (Ex. 9 at 1–5, 11, 15, 21–22). The filing occurred fewer than sixty days after the September 7 conference and nineteen days after circulation of the draft ordinance.

159. Plaintiffs accept that the Armstrong County Court of Common Pleas rejected their state-law challenge to the Declaration's validity and do not ask this Court to reverse that ruling or invalidate the taking.

160. Keffalas's appraisal valued the condemned acreage at $275 and expressly stated that the amount did not include fence-relocation costs (Ex. 9 at 21–22). Apollo's April 2, 2026, letter separately valued fence relocation at $3,000 and stated that checks totaling $3,275 were enclosed as estimated just compensation without prejudice to the parties' further rights (Ex. 9 at 19–20). Plaintiffs accepted the tender only pro tanto.

161. Any final state compensation determination receives the preclusive effect required by law, and Apollo receives full credit for amounts paid or awarded for the same interest and injury. This Complaint seeks only the alleged federal shortfall and does not challenge the Declaration's validity.

**J. Renewed 2026 Permit Process and Unresolved Operative Record**

162. At the January 14, 2026, conference, the Court encouraged a renewed process. On January 20, Plaintiffs delivered Apollo a signed BVNA application, applicant-signed MPAF portion, certification, previously reviewed architectural drawings, the accessibility variance, and supporting materials. Plaintiffs retained a pre-delivery scan. (ECF No. 213 at 2–4 & Ex. D.)

163. Neither Plaintiff signed a replacement application or authorized Apollo, Troup, Kanish, or BVNA to alter their answers, add representations, or insert conditions as though Plaintiffs accepted them. Plaintiffs recognize that an official may impose a lawful condition through an identified act; they allege later entries lacked an identified author, authority, or legal effect.

164. At Apollo's January 27, 2026, public Council meeting, Scott Brunermer criticized Apollo's administration of change-of-use and code-enforcement requirements, including asking whether 725 North Warren Avenue had received a transfer inspection and whether Mark Tarle's auto-repair use and Jennifer Mullins-Tarle's Coffin Bean business had received any required conditional-use or other municipal approvals.

165. On January 28, 2026, Apollo marked the application "Approved." It bore Troup's signature and the handwritten notation, "Production appurtenant to primary retail use," which Plaintiffs did not supply. The notation cited no ordinance, made no accessory-use findings, defined no production limit, and did not state whether it was binding, advisory, or reviewable. (ECF No. 213, Ex. D; ECF No. 215 at 1–3 & Ex. 1.)

166. On February 6, Troup emailed the completed version "for your records." The payment field first stated payment on "1-20-28" and was later changed to "1-20-26," although Plaintiffs paid nothing on January 20. The entries are pleaded as record-instability evidence, not a separate violation or proof of filing date. (ECF No. 213, Ex. D; ECF No. 215-1.)

167. On February 12, BVNA's counsel sent an initial review packet containing Troup's signed MPAF. Before then, neither entity had identified the January 20 packet as incomplete, listed missing mandatory materials, or documented an extension of the decision period. (ECF Nos. 214-2, 214-4, 214-5.)

168. BVNA nevertheless requested more explanations, project-cost information, architect documentation, and another full-size plan set. Plaintiffs responded that evening and requested legal authority for any condition of approval.

169. The review concerned the same drawings Kanish said in May 2020 were approved and held by BVNA. BVNA did not explain their disposition, insufficiency, or whether the 2020 approval remained operative.

170. On March 1, 2026, BVNA reviewer Rodney Smay stamped the plans, prepared an inspection card, and changed the lower-level classification from F-1 to S-1. On March 2, Kanish approved the M/S-1 classification, created Permit No. BVA26-040, and calculated the fee. (ECF No. 214 ¶¶ 7–8.)

171. The permit identified M/S-1, although Plaintiffs' signed application, certification, plans, and BVNA's project code analysis identified mixed M/F-1 retail and soap production. The lower-level plan designated F-1 before Smay changed it to S-1, while the code summary retained F-1 factory-industrial and fire-protection analysis with a later handwritten S-1 notation. BVNA issued no contemporaneous decision identifying a defect in F-1, explaining the change, or applying S-1 provisions. (ECF No. 213, Exs. A–C; ECF No. 214 ¶ 8; ECF No. 216 at 2–3.)

172. On March 3, BVNA said the permit had issued March 2, was delivered to Apollo, and could be picked up after payment of $404.50. On March 5, BVNA said it was only prepared and would issue after payment. The permit stated, "Date Issued: 3/2/2026." BVNA did not reconcile these positions. (ECF No. 213, Exs. A & E; ECF No. 214 ¶¶ 9, 16.)

173. On March 5, Scott went to Apollo to inspect the file. Staff initially denied access on Kanish's instruction. After Scott presented a signed RTKL request citing 65 P.S. §§ 67.701–703 and Apollo contacted Kanish, staff allowed inspection and photographs. Apollo later told this Court no RTKL request had been submitted, although the filed request shows otherwise. (ECF No. 213, Ex. F; ECF No. 214 ¶ 10; ECF No. 215 at 2; ECF No. 216 at 3–4.)

174. On March 9, BVNA said Smay selected M/S-1 "for the sake of moving the process along." It offered Plaintiffs three choices: accept and pay; submit another statement or revised drawings for M/F-1; or declare an impasse and return to Court. BVNA did not explain why the existing signed M/F-1 materials were insufficient.

175. On March 16, BVNA assigned March 1 as the M/S-1 filing date and March 10 as the M/F-1 filing date, although Plaintiffs delivered the application January 20 and BVNA received it January 29. BVNA identified no written extension, timely incompleteness notice, or code-cited denial of the January M/F-1 submission.

176. BVNA said the marked drawings had been transferred to Apollo and were no longer accessible to BVNA. Its electronic production thus omitted the complete marked set held by Apollo. (ECF No. 214 ¶¶ 8, 12–13 & Exs. 4–5.)

177. On March 19, BVNA generated or transmitted an M/F-1 version with the same permit number, project number, and March 2 issue date as the M/S-1 version. It issued no dated amendment or superseding decision stating whether the later version replaced, amended, reissued, or voided the first. (ECF No. 214 ¶¶ 8, 16; ECF No. 216 at 3 & Ex. A.)

178. In ECF No. 214, BVNA and Kanish acknowledged Kanish directed the initial access denial, BVNA lacked access to drawings delivered to Apollo, and document disputes could be addressed after payment and before inspection. (ECF No. 214 ¶¶ 10, 13, 16.)

179. Apollo identified Troup as the author of the "Production appurtenant to primary retail use" notation but said it did not affect approval. Because Apollo marked the municipal application approved and represented that the notation did not alter that approval, the absence of municipal approval could no longer serve as a stated prerequisite to BVNA action. Neither Apollo nor BVNA identified any later withdrawal, revocation, or modification of the approval. The remaining dispute concerned the notation's legal effect, BVNA's alteration of the requested F-1 classification, the competing M/S-1 and M/F-1 permit versions, and the absence of one controlling permit and reviewed drawing set—not an unsigned municipal application. (ECF No. 215 at 1–3 & Ex. 1; ECF No. 216 at 1.)

180. In June 2026, BVNA billing contacted Plaintiffs about an unpaid permit. Counsel said an automated list identified permits considered issued but unpaid and referred to "the same" permit at Apollo. BVNA did not identify whether the invoice concerned M/S-1, M/F-1, or an amended BVA26-040.

181. After Plaintiffs requested the controlling permit, drawings, classification, fee basis, and invoice components, BVNA stopped billing contacts and disclaimed collections. It still maintained that a permit had issued, the drawings remained at Apollo, no additional permit documents existed, and inspection would follow payment.

182. The purported itemization was one $404.50 project charge and identified no hours, services, components, or applicable permit version. Plaintiffs did not refuse a lawful fee; they requested the public fee schedule, an itemized basis, and identification of the permit and reviewed documents payment would activate. Pennsylvania regulations permit a municipality or third-party agency to withhold permit issuance until required fees are paid, but require the applicable fee schedule to be made available to the public. 34 Pa. Code §§ 401.2a(b), (d), 403.43(m).

**K. Public Targeting, Fence-Site Interference, and Council Notice**

183. Before May 2021, Plaintiffs had pursued records, state proceedings, public criticism, and private complaints; Troup, Shupe, and the Tarles knew through communications, meetings, and litigation.

184. In May 2021, while contractors installed a four-foot fence within the surveyed boundary, Councilmember Mark Tarle appeared in an Apollo Police shirt and ordered them to stop without written authority. Jennifer Mullins-Tarle photographed and confronted Plaintiffs and contractors; Troup and the Mayor were present during part of the confrontation, which drew 10–15 people and State Police.

185. At the May 27, 2021, Council meeting, Troup identified herself as the owner of a commercial business in the 700 block and stated that Plaintiffs' fence hindered her ability to receive box-truck deliveries, forced her to accommodate drivers attempting to turn around, and increased traffic difficulties affecting her business. She accused Plaintiffs of installing the fence solely out of "spite."

186. Apollo's solicitor then described the assembled complaints as a "critical component" supporting relocation of the fence and confirmed prior contact with Plaintiffs' counsel. Council continued addressing the issue without issuing Plaintiffs a written violation, adjudicative decision, or identified legal basis requiring relocation.

187. At the July 22, 2021, meeting, Jennifer Mullins-Tarle said Plaintiffs' cases cost taxpayers nearly $60,000 "all over a permit and a $300 fine," after which Council retained federal counsel. Plaintiffs do not claim that criticism alone violated the Constitution.

188. A 2021 election communication and social-media statements by then-Councilmember Jennifer Mullins-Tarle linked Plaintiffs' litigation and records activity to alleged harassment, zoning violations, and taxpayer burden. She accused Plaintiffs of "borderline harassment," being "hell bent on destroying the good name" of Council, and diverting staff through records requests. When

criticized for her treatment of the public, she replied, "Nah. Only these two" and "I only denigrate these two," because they had a "five year axe to grind" and were "sitting on Facebook bitching and poking holes" in Borough efforts. These statements are pleaded only as evidence of Council knowledge, retaliatory hostility, singling out, motive, and notice—not as defamation or liability based solely on her speech.

189. On January 27, 2026, Scott raised unresolved fence, condemnation, comparator, and conflict issues before Council. The Council President said they would be "looked into" while the permit process continued.

**L. Commercial Reality of the Intended Property Use**

190. Plaintiffs invested about $125,829 in acquisition and improvements and $33,358 in utilities and taxes while seeking lawful use. These figures show investment and carrying costs, not automatic damages.

191. Plaintiffs seek only carrying costs caused by actionable additional ownership, nonuse, or failed disposition—not costs they would have incurred anyway.

192. SloppySoap's vendor agreement, purchase order, later retail inquiries, and 2025 mall storefront show the intended use was concrete. Plaintiffs seek owner damages, not corporate profits or goodwill.

**M. Walker Sale and Marketability Consequences**

193. In March 2025, Plaintiffs listed the Property through Lori Weig-Tamasy, who contacted Apollo for clarification of the Property's zoning and use status. Weig-Tamasy reported that Troup told her the front ramp was "not exactly L&I approved but serviceable" and that the back deck was "definitely not approved." (Ex. 10 at 7.)

194. Troup's own email acknowledged that DLI had issued a waiver for the front ramp but stated that the rear exit remained unapproved. (Ex. 10 at 7.) Apollo had previously issued a rear-deck permit. (Ex. 10 at 8.)

195. On April 24, 2025, Walker offered $155,000 and expressly conditioned the proposed purchase on, among other things, resolution of the Property's occupancy status (Ex. 10 at 1–3). Plaintiffs countered at $175,000 on April 28 (Ex. 10 at 4). After additional communications concerning appraisal, inspection, price, and allocation of costs, Plaintiffs ended the negotiations on April 29, 2025 (Ex. 10 at 5–6). The occupancy contingency and related communications provide concrete evidence that unresolved municipal status affected the proposed transaction (Ex. 10 at 3–6).

196. Plaintiffs plead the Walker offer, occupancy contingency, counteroffer, due-diligence demands, and termination of negotiations as evidence of impaired marketability and a lost sale opportunity. (Ex. 10 at 1–6).

## V. CLAIMS FOR RELIEF

### COUNT I - PROCEDURAL DUE PROCESS
### 42 U.S.C. § 1983 - Fourteenth Amendment
### Against the Borough of Apollo, Bureau Veritas North America, Inc., Brenda Troup, Grant Kanish, and Rodney Smay

197. Plaintiffs incorporate paragraphs 1–42, 64–131, 134–155, 162–182, and 191–196 only to the extent relevant to this Count.

198. This Count does not revive the pre-2022 procedural-due-process claim dismissed at ECF No. 82. Earlier events provide background, notice, custom, and causation. Count I concerns later conduct and injuries from the renewed 2026 process and other post-ECF No. 82 acts not previously adjudicated.

199. Plaintiffs plead Smay's 2020–2023 conduct as background establishing his assigned role, project knowledge, and notice. The individual-capacity claim against Smay in this Count arises from his 2026 conduct alleged in paragraphs 170–171.

200. Procedural due process requires a protected property interest and inadequate process. *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006). Fee-simple ownership protects Plaintiffs' use, improvement, occupancy, marketability, and alienability. They claim no unconditional permit right; they allege Defendants controlled the process and blocked reliable construction, inspection, occupancy, use, and sale.

201. Absent a written extension, Pennsylvania law required the Building Code Official to grant or deny the commercial application within thirty business days; give written, code-cited reasons for denial; mark reviewed and approved construction documents, identify nondesign changes, and return a reviewed set. A permit applicant could appeal the Building Code Official's action on the application to a board of appeals. 35 P.S. § 7210.502(a); 34 Pa. Code § 403.43(a), (c), (i).

202. The 2026 process repeated the defect. Plaintiffs' signed application, certification, plans, and code analysis identified M/F-1. Troup added the unexplained "Production appurtenant to primary retail use" notation; Smay changed the lower level from F-1 to S-1; and Kanish approved the change, created Permit No. BVA26-040, and set the fee. BVNA later generated an M/F-1 version with the same permit number, project number, and March 2 issue date as the M/S-1 version.

203. Defendants took inconsistent positions on whether the March 2 permit had issued, assigned different filing dates to M/S-1 and M/F-1 tracks from the same January submission, divided custody of stamped drawings between BVNA and Apollo, and deferred disputes until payment. In June, BVNA still treated an unidentified version as issued but unpaid while stating no additional permit documents existed.

204. Defendants provided no integrated record identifying the controlling permit, drawings, classification, conditions, code edition, fee, inspections, issue date, and review procedure. Plaintiffs could not know what payment would activate, what standards governed, or what action could be appealed.

205. A zoning-hearing-board appeal generally existed for a Zoning Officer's failure to act. Apollo Zoning Ordinance §§ 1703(A)(3), 1707; 53 P.S. § 10909.1(a)(3). Before 2026, Defendants did not identify the MPAF as a zoning application while treating Apollo's nonaction as blocking an appealable Building Code Official action. In 2026, however, Apollo approved the municipal application and identified no later withdrawal or modification. The asserted absence of municipal approval was therefore no longer the impediment; the unresolved governmental action was BVNA's failure to identify one controlling permit, reviewed drawing set, classification, conditions, and appealable Building Code Official disposition. See *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

206. The deprivation was predictable and administered by actors able to provide process. Troup controlled or participated in Apollo's approval and permit record; Smay controlled or participated in BVNA's plan review, plan markings, inspection card, and classification change; Kanish controlled or participated in BVNA's permit issuance, access directions, and final permit record; and the entities maintained or ratified the structure. Pre-deprivation safeguards were practicable. See *Zinermon v. Burch*, 494 U.S. 113, 136–39 (1990).

207. Troup participated by adding the January notation, controlling or participating in the Borough permit record, and failing to identify Apollo's final position or the notation's legal effect and reviewability.

208. Kanish participated by approving the F-1-to-S-1 change, creating Permit No. BVA26-040, directing the initial access denial, insisting disputes could follow payment, and failing after notice to

identify the controlling permit, reviewed drawings, issuance status, or appealable Building Code Official action.

209. Smay personally participated by stamping the 2026 plans, preparing the inspection card, and changing the lower-level classification from F-1 to S-1. No contemporaneous code-cited determination identified a defect in F-1 or explained his change. His alteration became part of the M/S-1 record that BVNA later failed to reconcile with an M/F-1 version bearing the same permit number, project number, and issue date.

210. By 2026, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436–37 (1982), *Zinermon*, and *Alvin* gave fair warning that officials controlling the only decisional process could not defeat review by withholding the notice, decision, or record required to invoke it.

211. The post-ECF No. 82 conduct caused additional loss of use, delay, carrying and professional costs, impaired marketability and alienability, and emotional distress.

212. The post-ECF No. 82 deprivation is not merely a failure to decide. Defendants represented that a permit existed or was ready, treated an unidentified permit as operative for billing and inspection, and maintained restrictions on Plaintiffs' use while withholding the integrated record needed to identify the governing classification, drawings, conditions, fee, and appealable action.

213. The OOR and deposition evidence supports that the continuing ambiguity was not caused by missing institutional information. Apollo and its contractors could collect the relevant communications and records through Troup, Shupe, Kanish, BVNA, and Andreassi-associated sources, but did not translate those internally available materials into a definitive disposition.

214. Defendants did not merely fail to reach a final decision; Plaintiffs allege they used nonfinality as the operative decision. By maintaining practical restraints while withholding the notice, record, and single governmental action required to invoke meaningful review, Defendants made the process itself the means of deprivation.

215. Plaintiffs do not seek federal review or reversal of any state court judgment; rather, this Count seeks damages solely for independent, distinct administrative deprivations inflicted by Defendants during the execution of local permitting processes.

**WHEREFORE,** Plaintiffs request judgment on Count I and the applicable relief stated below.

**COUNT II - FIRST AMENDMENT AND PETITION-CLAUSE RETALIATION**
**42 U.S.C. § 1983 - First and Fourteenth Amendments**
**Against the Borough of Apollo, Bureau Veritas North America, Inc., Brenda Troup, Grant Kanish, Deanna Shupe, Cynthia McDermott, Scott Andreassi, and Mark Tarle**

216. Plaintiffs incorporate paragraphs 1–34, 40–190, and 193–196 only to the extent relevant to this Count.

217. A First Amendment retaliation claim requires protected activity, materially adverse action, and causation. *Thomas v. Independence Township*, 463 F.3d 285, 296 (3d Cir. 2006); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

218. Causation may rest on unusually suggestive timing, a timed pattern of antagonism, or the record as a whole. *Lauren W.*, 480 F.3d at 267.

219. Plaintiffs engaged in protected speech and petitioning by challenging enforcement, seeking records and standards, pursuing administrative and judicial relief, addressing Council, filing private complaints and this action, and criticizing unequal treatment. Each acted personally as an owner, applicant, requester, speaker, and litigant.

220. Apollo, BVNA, and the individual Defendants learned of that activity through direct communications, Council and RTKL proceedings, enforcement matters, administrative complaints, and this litigation, as detailed below.

221. BVNA and Kanish acted under color of state law while performing Apollo's delegated UCC review, permitting, inspection, and occupancy functions. BVNA liability rests on its own policy, practice, ratification, or continuation alleged here and in Count VIII—not respondeat superior.

222. Before citations issued, Plaintiffs had challenged vacancy in writing and Apollo's Solicitor acknowledged the challenge. Troup communicated with Kier about citation timing; Kier later testified he was told to cite Janet after Plaintiffs refused the disputed inspection.

223. At the January 27, 2026, Council meeting, with Troup and Tarle present, Scott criticized Apollo's treatment of Tarle's auto-repair property and Jennifer Mullins-Tarle's Coffin Bean business as comparators. Troup controlled or participated in the Borough application record and added the challenged notation the next day. The one-day sequence supports retaliatory causation as to Troup.

224. After Plaintiffs' protected activity, adverse actions included vacancy and citation escalation, continued MPAF gatekeeping, materially incomplete records responses, and fence-site interference.

225. Later adverse actions included Troup's municipal-status statement during Walker due diligence that the permitted rear deck was "definitely not approved"; her January 28 notation after Scott's Council criticism; Kanish's inconsistent M/S-1 permit record; the initial file-access denial; the pay-first procedure; and the continued failure to identify one operative permit after Plaintiffs objected.

226. Earlier events are direct conduct only if timely and independently actionable; otherwise they show notice, motive, policy, ratification, coordination, causation, and the character of later acts. Plaintiffs seek no relief against Kier or Jennifer Mullins-Tarle and no relief requiring invalidation of Janet's vacancy conviction.

227. Kanish instructed Borough staff to deny Scott initial access to the permit file; access followed only after Scott presented a written RTKL request.

228. After Plaintiffs questioned McMillen's authority and qualifications, Andreassi requested his CV or résumé. Kanish acknowledged that BVNA's local office did not possess it and, in the same response, proposed citation "Offense" because Plaintiffs were "always asking for documents." Kanish

later approved the 2026 F-1-to-S-1 change, created Permit No. BVA26-040, directed the initial file-access denial, and participated in the competing permit records and inconsistent issuance positions.

229. McDermott had actual notice by July 11, 2018, when Plaintiffs' counsel sent her a detailed vacancy challenge after personally obtaining the invoked ordinances from the Borough office. Despite access to Borough records, she did not identify the controlling ordinance, reconcile reliance on Ordinances 267-15 and 272-16, or decide Plaintiffs' objections. She redirected Borough questions to Kanish although Apollo imposed vacancy status and threatened police referral.

230. After that written challenge, McDermott continued administering the vacancy process while citation enforcement advanced without Plaintiffs receiving the standards, evidence, or decision needed to challenge or cure the designation. That continuation supports adverse action and causation. McDermott redirected Borough questions to Kanish even though Apollo—not BVNA—imposed vacancy status and threatened police referral. Plaintiffs allege that, after receiving written notice of the unresolved statutory and ordinance issues, she continued routing the matter through the same nonfinal administrative loop rather than issuing or obtaining a Borough determination.

231. Shupe participated through her records role. On September 8, 2021, after repeated requests for governing standards, she attested that no other change-of-use ordinance or Borough code existed, although Apollo and BVNA had filed Ordinance 271-16 less than two weeks earlier.

232. The attestation obstructed Plaintiffs' ability to identify and challenge the regulatory framework by representing that no other change-of-use law existed when Ordinance 271-16 had just been filed. Its timing and content support causation as to Shupe.

233. Andreassi participated outside courtroom advocacy by forwarding MPAF requests to Kanish, seeking the application and supporting documents, coordinating meetings and administrative responses, participating in the Ordinance 271-16 records search, and later demanding fence relocation. His "back door" comment and endorsement of Kanish's "stupid questions" complaint

show knowledge and motive. Plaintiffs do not seek liability for legal advice, litigation advocacy, or representation alone.

234. Mark Tarle, while a councilmember and wearing an Apollo Police shirt, ordered Plaintiffs' contractors to stop without written authority. Jennifer Mullins-Tarle photographed and confronted Plaintiffs and contractors; Troup and the Mayor were present; and Apollo soon demanded fence removal or relocation. Count II concerns only named Defendants' materially adverse, nonlegislative acts. Jennifer Mullins-Tarle's conduct is context and circumstantial evidence only.

235. As to Troup, causation is supported by her municipal-status statement during Walker due diligence, prior objections to her overlapping governmental and neighboring-property interests, and the one-day interval between Scott's January 27, 2026, criticism and her notation.

236. As to Kanish and BVNA, causation is supported by Kanish's hostility toward Plaintiffs' questions, his access-denial instruction, competing permits after renewed objections, and BVNA's continued unidentified issued-and-unpaid position after notice of the conflict.

237. As to Shupe, causation is supported by the timing and content of her September 8, 2021, attestation, issued after repeated requests and less than two weeks after Ordinance 271-16 was filed in this action.

238. Eichenlaub and Thomas established that citizens' land-use complaints and petitions were protected and officials could not answer them with materially adverse governmental retaliation. *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282–84 (3d Cir. 2004); *Thomas*, 463 F.3d at 296–97. Plaintiffs allege retaliatory use of permitting, vacancy, records, enforcement, and property-control authority—not criticism, advocacy, or silence alone.

239. The retaliation caused additional permit and occupancy delay; architectural, engineering, records, and compliance expenses; Walker-transaction interference; loss of use; impaired marketability; additional carrying costs; lost sale opportunity; and emotional distress.

240. Troup's testimony and the OOR productions further establish continuity among the actors responding to Plaintiffs' protected requests. Shupe's broad no-additional-record attestation, issued after an Andreassi-requested search and shortly after Ordinance 271-16 had been filed in this action, followed by later disclosure of additional contractor and email records, supports the alleged retaliatory use of records administration.

241. Andreassi's collection and response role, the Andreassi-associated production source, his "back door" characterization, and his endorsement of Kanish's hostility toward Plaintiffs' questions support knowledge and motive. Plaintiffs do not rely on the source label alone and do not allege that Andreassi authored every produced communication.

242. The Craft-Troup-Shupe MPAF sequence supplies circumstantial evidence of the broader coordinated response: Craft removed the stated parking and land-development obstacle and required no further information; Troup stated that she would sign; Shupe participated in routing the issue; yet Plaintiffs received neither the promised signoff nor a written denial. Craft's conduct is pleaded here as context and coordination evidence, not as a separate Count II claim against him.

**WHEREFORE,** Plaintiffs request judgment on Count II and the applicable relief stated below.

## COUNT III - CLASS-OF-ONE EQUAL PROTECTION

42 U.S.C. § 1983 - Fourteenth Amendment
Against the Borough of Apollo, Bureau Veritas North America, Inc., Brenda Troup, Grant Kanish, Cynthia McDermott, and Deanna Shupe

243. Plaintiffs incorporate paragraphs 1–32, 40–155, 162–182, and 191–196 only to the extent relevant to this Count.

244. A class-of-one claim requires intentional differential treatment of persons similarly situated in all relevant respects without a rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020). Comparisons must address the specific governmental function. *Stradford v. Secretary Pennsylvania Department of Corrections*, 53 F.4th 67, 74 (3d Cir. 2022).

245. Comparators need not be identical in every respect. Each comparison concerns the governmental function, responsible official, regulatory posture, and treatment material to that comparison. Plaintiffs allege that each comparator was similarly situated in those relevant respects but received materially more definite, prompt, or less burdensome treatment.

246. Apollo treated Plaintiffs differently in vacancy enforcement. Shiloh owned the identical structure immediately before Plaintiffs under the same regime and overlapping officials, yet Apollo's records show no completed vacancy inspection, findings, registration or waiver payment, police summons, or citation against Shiloh.

247. Plaintiffs also told McDermott the Persoskie property appeared unoccupied after its owner died in 2014. Known records show no immediate vacancy designation, inspection demands, escalating fees, police referral, or citations like those imposed on Plaintiffs.

248. Apollo treated Plaintiffs differently in MPAF signoff and coordinated permitting. Its 809 North Warren project received immediate MPAF approval and temporary occupancy despite unresolved accessibility, restroom, egress, railing, fire-escape, and other work.

249. Shupe signed Apollo's MPAF the day submitted, BVNA issued a permit the next day, and temporary occupancy followed within days. Plaintiffs' contemporaneous application received neither a signed MPAF, written denial, nor temporary occupancy.

250. BVNA and Kanish treated Plaintiffs differently in change-of-use classification, inspection, and final occupancy. The Parker project converted a former church under Permit No. A20-021 and Project No. 2020-401156.

251. BVNA identified Parker as "Alterations/Change of Use," stated A-2 and R-3 classifications, recorded a final inspection on April 26, 2021, and issued a Kanish-signed Certificate of Occupancy on April 29. Plaintiffs' former-church project received no comparable internally consistent permit record, stable classification, final inspection, or occupancy decision.

252. BVNA and Kanish also treated Plaintiffs differently from Earthbound, an operating business in a former church. On May 16, 2022, Kanish acknowledged BVNA had no UCC change-of-use or occupancy permit for Earthbound.

253. Kanish did not order Earthbound to stop. He gave the owner ten days to contact BVNA and begin compliance if needed, and Earthbound continued in-store activity. By contrast, BVNA and Kanish barred Plaintiffs' operation pending Apollo's unresolved approval while issuing neither approval nor code-cited denial.

254. Apollo, Kanish, McDermott, and Troup also handled Davis Lawnmower Repair differently. They resolved suspected unpermitted commercial use through inquiry, communication, and clarification—not an MPAF impasse, citation, prolonged enforcement, or refusal to decide. Davis is offered only for that administrative difference.

255. The adjacent 725 North Warren property is a limited comparator for Apollo and Troup's transfer, occupancy, enforcement, records, and recusal functions and supports intentional selective administration.

256. Troup retained a legal interest in 725 North Warren while serving as Zoning Officer. On April 22, 2026, she signed Apollo's RTKL response reporting no transfer, occupancy, inspection, UCC, plan-review, enforcement, recusal, or reassignment records beyond landlord registration. Apollo identified no recusal or neutral substitute.

257. Plaintiffs do not allege every requested record was legally required or the living-trust transfer triggered all arm's-length-transfer rules. They rely on the absence of documented regulatory handling, recusal, reassignment, or neutral review while Troup retained an interest and answered the request.

258. Parking does not explain the different MPAF treatment. Craft found parking addressed and no land-development plan required, while stating Kanish could still "give them grief" over accessible parking.

259. Plaintiffs identified zoning language they said excepted the Town Center Overlay District from off-street parking. Apollo issued no decision, removed the language through Ordinance 291-22 while the application remained pending, and later offered an applicant-specific waiver for the same pre-amendment application.

260. No relevant distinction explains why 809 North Warren received immediate MPAF approval and temporary occupancy; Parker received a permit, classifications, final inspection, and occupancy certificate; Earthbound continued operating during compliance; Davis received informal resolution; Shiloh and Persoskie avoided immediate vacancy enforcement; and 725 North Warren lacked a documented regulatory or recusal record while Troup retained an interest.

261. Plaintiffs instead received a pre-operation bar, an unsigned and undenied MPAF, inconsistent classifications, continuing vacancy consequences, and no final, code-cited disposition.

262. The difference was intentional, not isolated error. The same officials controlled the compared functions, knew Plaintiffs sought standards and decisions, and continued different treatment after the distinctions were raised.

263. Troup administered vacancy and MPAF functions against Plaintiffs, added the 2026 notation, and issued Apollo's no-record and no-recusal response for adjacent property in which she retained an interest.

264. The lack of documented recusal, reassignment, or neutral review supports intentional selective administration rather than accidental recordkeeping differences.

265. Kanish resolved Davis informally, completed Parker through permit and occupancy finality, allowed Earthbound post-occupancy compliance without closure, and identified Apollo's MPAF signature as Plaintiffs' remaining item.

266. Kanish then approved the F-1-to-S-1 change, created Permit No. BVA26-040, participated in M/S-1 and M/F-1 tracks, and failed to identify one stable permit and reviewed plan set comparable to Parker's definitive records. BVNA liability rests only on Count VIII's entity-liability bases, not respondeat superior.

267. McDermott imposed and pursued formal vacancy treatment against Plaintiffs despite different treatment of Shiloh and Persoskie, and she participated in Davis's informal handling.

268. Shupe immediately signed Apollo's 809 North Warren MPAF but, despite notice of Plaintiffs' contemporaneous application, gave Plaintiffs neither a signed MPAF nor municipal denial.

269. Apollo is liable, if at all, for the municipal decisions, practices, and official acts identified here and in Count VIII.

270. Olech clearly established that government may not impose an irrational, property-specific burden on one owner while giving materially lighter treatment to similarly situated owners. These function-specific comparisons gave fair notice that officials could not selectively withhold signoff, finality, or a compliance path without a rational distinction.

271. The differential treatment caused prolonged loss of use, professional and administrative expenses, impaired marketability and alienability, interference with disposition, diminished value and equity, and emotional distress.

272. The custody and production evidence undermines an explanation based on innocent institutional ignorance. Apollo's officials could retrieve records through Troup, Shupe, Andreassi,

and its contractors, and the same Apollo-BVNA structure promptly completed the 809 North Warren process while Plaintiffs remained subject to an unsigned-and-undenied MPAF and later an unreconciled permit record.

273. Shupe's immediate processing of Apollo's MPAF, contrasted with her later broad no-additional-record attestation and Plaintiffs' unresolved municipal record, and Craft's written conclusion that parking was addressed and no land-development plan was required, further support intentional differential administration rather than a technical distinction.

**WHEREFORE,** Plaintiffs request judgment on Count III and the applicable relief stated below.

**COUNT IV - VOID FOR VAGUENESS**
42 U.S.C. § 1983 - Fourteenth Amendment
Against the Borough of Apollo

274. Plaintiffs incorporate paragraphs 1–34, 43–70, 102–131, 143–155, 162–182, and 191–196 only to the extent relevant to this Count.

275. A law is vague as applied when it lacks fair notice of the conduct or status triggering liability or standards constraining arbitrary enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983).

276. Fair notice is required before civil or administrative penalties, with greater precision where criminal prosecution, daily fines, or imprisonment are authorized. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

277. Plaintiffs challenge only present and credibly threatened future application of Ordinance 282-21 to the Property, not Apollo's authority to regulate genuinely abandoned, unsafe, unmaintained, or nuisance property.

278. Ordinance 282-21 replaced 272-16. The earlier ordinance is historical evidence of standards Apollo changed, retained, or failed to reconcile; Plaintiffs seek no prospective relief under it.

279. Ordinance 282-21 defines "Abandoned" as deserted or discarded for more than 365 days, "Vacant" by the absence of a lawfully licensed business or lawful resident, and "Vacant Building" as property unoccupied more than 180 days or subject to specified foreclosure, bankruptcy, or tax-sale conditions.

280. Article III applies the Ordinance to abandoned and vacant property vacant more than 180 consecutive days but does not identify the controlling definition, start date, or governmental act making a commercial business "lawfully licensed."

281. It also does not explain how those definitions apply during active renovation when Apollo's unresolved approval process prevents lawful operation.

282. The Ordinance addresses registration, inspection, nuisance, waiver, and removal without stating their order.

283. Article IV requires registration of vacant or abandoned property, continues fees only while it is a public nuisance, and requires registration within 180 days after it becomes a public-nuisance building.

284. Article IV appears to allow a vacant building's removal from the list once it ceases being a nuisance. Article X, however, calls for inspection after registration to determine whether the building is subject to the Ordinance. The Ordinance does not state whether vacancy, nuisance, registration, or inspection first triggers the others.

285. Article IV permits demands for "any other information deemed necessary" without relevance, scope, criteria, or limits. The Ordinance provides no review of designation, registry placement, information demands, inspection, waiver, revocation, or refusal to remove a property.

286. Article VII permits a current-year waiver if listed conditions are met but adds an undefined "other good cause" alternative. It does not state whether preceding conditions are cumulative, alternative, or waivable by Council.

287. Permanent-waiver provisions likewise combine numbered requirements, "other good cause," and revocation without identifying cumulative or alternative conditions or required findings.

288. The appended waiver form does not match Article VII. It adds sale or rental requirements, sewer-project connection on pain of automatic denial, a realtor-sign question, and demands for contracts, signage, or other information Council requires.

289. The Ordinance does not say whether the form has independent force, which waiver it governs, or how an owner challenges conditions absent from the enacted provisions.

290. These uncertainties carry penalties. Article XI allows civil or criminal prosecution for unpaid inspection fees and declares a missed inspection probable cause for a search warrant.

291. Article XX authorizes a $500 fine, costs, up to thirty days' imprisonment, or both, with each day a separate violation.

292. Ordinance 271-16 separately governs use and occupancy, requires published certificate standards, allows temporary occupancy, and requires a written violation notice stating reasons, corrective action, and a reasonable cure period.

293. Ordinance 282-21 does not explain how its vacancy, registration, inspection, waiver, nuisance, cure, and removal provisions interact with Ordinance 271-16's occupancy process.

294. The Municipal Code and Ordinance Compliance Act, 68 P.S. §§ 1082, 1082.1, 1083, separately governs resale inspections, distinguishes violations from substantial violations, requires the corresponding certificate, and provides a twelve-month correction period that may be lengthened but not shortened.

295. That state-law framework is pleaded only as unreconciled regulatory context, not a freestanding MCOCA claim or a rule for every later change-of-use decision.

296. Apollo has never issued a determination identifying the Property's operative category, vacancy date, evidence, required license or approval, nuisance basis, objective waiver criteria, removal event, or review procedure, or explaining how Ordinances 271-16 and 282-21 interact.

297. Future enforcement is credible because Plaintiffs still own, maintain, market, and seek occupancy or disposition; occupancy remains disputed; Apollo offered only temporary suspension; and Apollo has neither permanently ended vacancy status nor disclaimed renewed registration, inspection, fees, citations, or penalties.

298. Plaintiffs seek only prospective relief—no reversal, compensation, expungement, reimbursement, or collateral relief from Janet's conviction—and need not prove that conviction invalid.

299. *Heck v. Humphrey* does not bar a § 1983 action seeking only prospective relief from future enforcement. *Olivier v. City of Brandon*, 607 U.S. 552, 560–67 (2026).

300. As applied here, overlapping definitions, an unidentified licensing requirement, circular registration and inspection, an uncertain nuisance trigger, unbounded information demands, conflicting waiver standards, added form conditions, no review, and unresolved interaction with Ordinance 271-16 deny fair notice and permit arbitrary enforcement.

**WHEREFORE,** Plaintiffs request the prospective declaratory and injunctive relief stated in Paragraph D of the Prayer for Relief.

**COUNT V - SUBSTANTIVE DUE PROCESS**

42 U.S.C. § 1983 - Fourteenth Amendment

Against the Borough of Apollo, Bureau Veritas North America, Inc., Brenda Troup, and Grant Kanish

301. Plaintiffs incorporate paragraphs 1–32, 35–155, and 162–196 only to the extent relevant to this Count.

302. Plaintiffs' fee-simple ownership of the Property and the traditional rights to possess, use, improve, exclude others from, market, and alienate it constitute the protected property interest supporting this Count. Plaintiffs do not claim a fundamental substantive-due-process right to a particular permit, classification, municipal form, procedure, or favorable land-use result. *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 141 (3d Cir. 2000).

303. Executive land-use conduct violates substantive due process only when, viewed in context, it is so egregious and abusive that it shocks the conscience. Ordinary hostility, delay, selective enforcement, bad faith, procedural irregularity, technical disagreement, or an incorrect municipal decision is insufficient. *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 400–02 (3d Cir. 2003); *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 285–86 (3d Cir. 2004).

304. Plaintiffs do not aggregate years of delay and label the result conscience-shocking. They allege that Troup and Kanish deliberately used complementary municipal and delegated UCC authority for private and retaliatory purposes, repeatedly shifted or revived barriers after prior issues had been addressed, and knowingly maintained governmental nonfinality that impaired Plaintiffs' use, occupancy, marketability, and sale of the Property.

305. Apollo and BVNA operated a closed administrative loop. Apollo relied on the absence of a lawfully operating business to maintain vacancy consequences; lawful operation required completion of BVNA's change-of-occupancy process; BVNA required Apollo's MPAF approval; and Apollo left that approval unresolved while invoking the resulting absence of occupancy approval. Neither actor supplied a complete and reviewable disposition breaking the loop.

306. By May 2020, Craft had concluded that parking was sufficiently addressed and no land-development plan was required, DLI had granted the accessibility variance, and Kanish

acknowledged that BVNA possessed approved drawings and identified Apollo's signed MPAF as the "last piece of the puzzle." Apollo nevertheless neither signed nor denied the MPAF at that time. Troup eventually signed it in March 2022, removing the previously asserted absence of municipal signoff, but no stable permit or code-cited denial followed. In 2023, Apollo waived parking, BVNA stated that no further action was necessary concerning the approved drawing revisions, and Apollo's counsel acknowledged that there was "no problem" with the proposed commercial space and that parking remained "the rub," yet no final disposition issued.

307. In 2026, Plaintiffs submitted signed M/F-1 application materials and architectural drawings identifying F-1, and Apollo marked the municipal application approved. Neither Apollo nor BVNA contemporaneously identified the submission as incomplete or issued a written, code-cited determination rejecting F-1. Smay nevertheless changed the lower-level classification to S-1, and Kanish reviewed and approved the resulting M/S-1 classification, created Permit No. BVA26-040, and calculated the fee. BVNA later stated that M/S-1 had been selected "for the sake of moving the process along," rather than identifying a contemporaneous code deficiency requiring the change.

308. After Plaintiffs challenged the alteration, BVNA generated or transmitted an M/F-1 version bearing the same permit number, project number, and March 2 issuance date as the M/S-1 version. Neither version was identified through a dated amendment, withdrawal, voiding document, or superseding determination as the controlling permit, and no complete reviewed and stamped drawing set was identified as corresponding to the operative M/F-1 record.

309. Kanish directed Apollo's initial refusal to allow Scott to inspect the permit file containing the disputed records. After repeated written notice of the competing permits, classifications, missing operative drawing set, and disputed issuance and fee status, Kanish and BVNA did not issue or identify one corrective or superseding determination. BVNA instead continued treating an unidentified version of Permit No. BVA26-040 as issued but unpaid.

310. Kanish's conduct supports an inference of predetermination and deliberate injury rather than neutral technical administration. Before a completed application existed, he stated that the building would not pass inspection; later proposed that Apollo go on "Offense" through citations so "maybe this could go away"; complained of Plaintiffs' "stupid questions"; approved the unexplained F-1-to-S-1 change; created the M/S-1 permit; directed the file-access denial; and maintained the competing permit record after notice.

311. Troup exercised zoning, vacancy, municipal-signoff, compliance, records, and transaction-related authority affecting Plaintiffs' Property while operating or being identified with Fish Bowl Too at nearby 725 North Warren Avenue and later holding a trustee interest in that commercial property. A public listing promoted parking "just around the corner"; Plaintiffs allege that Troup directed Fish Bowl Too customers to use Plaintiffs' separately deeded parking area; and Troup told Council that Plaintiffs' fence interfered with box-truck deliveries and vehicle circulation serving her business.

312. Plaintiffs therefore allege a concrete private commercial interest in Plaintiffs' parking, access, circulation, and continued inactivity, not merely an appearance of bias arising from neighboring ownership.

313. Despite notice of those overlapping governmental and private interests, Apollo identified no documented disclosure, recusal, reassignment, substitute zoning officer, or neutral-review process. Plaintiffs allege that Troup used the overlap to advance vacancy and parking positions against them, participate in pressure concerning the fence and access conditions affecting her business, prolong the Property's commercial inactivity, participate in the Borough-side permit and records process, and communicate materially incomplete municipal information during Plaintiffs' attempted sale.

314. During sale due diligence, Troup told Plaintiffs' realtor that the front ramp was not exactly L&I approved and that the rear deck was definitely not approved. DLI had granted a variance permitting the existing ramp condition, Apollo had issued a rear-deck permit, and Troup identified

no revocation, failed inspection, violation notice, or written denial establishing the adverse status she communicated. Those statements and the unstable municipal record materially contributed to buyer uncertainty and occupancy-related contingencies during the Walker transaction.

315. The timing and content of Troup's 2026 conduct further support an inference of intentional interference with protected petitioning. On January 27, Scott publicly criticized Apollo's code administration and its treatment of 725 North Warren Avenue. The application Apollo returned the following day bore Troup's new "Production appurtenant to primary retail use" notation. Apollo identified Troup as its author but supplied no ordinance authority, factual findings, date of insertion, legal effect, or review procedure, and retained the notation while asserting that it had no effect.

316. The 809 North Warren comparator supports the inference that the divided Apollo-BVNA structure was capable of producing prompt and definite coordinated action when Defendants chose to provide it: Apollo signed the MPAF on submission, BVNA issued the permit the next day, and temporary occupancy followed despite unresolved work. Plaintiffs' application through the same structure remained unresolved for years and, when renewed, produced competing permits without one identified controlling record.

317. Considered together, the alleged private commercial benefit, absence of recusal, retaliatory timing, express hostility, repeated barrier shifting, unauthorized classification change, direction of file-access denial, maintenance of contradictory permit records after notice, sale-related interference, and materially different treatment of another applicant plausibly allege self-dealing and deliberate injury, not merely negligent administration or an ordinary zoning disagreement.

318. Troup and Kanish are sued for their own executive and administrative acts, not merely their titles or supervisory positions. Apollo and BVNA are liable only through their own policies, customs, delegated governmental functions, final decisions, knowing ratification, or deliberately indifferent structural omissions alleged in Count VIII, and not through respondeat superior.

319. As a direct and proximate result of the actionable conduct alleged in this Count, Plaintiffs suffered additional loss of use, carrying and professional costs, inability to obtain a coherent operative permit record, impaired marketability and alienability, lost sale opportunity, diminished value or equity, emotional distress, and other nonduplicative injuries subject to proof and applicable limitations.

320. The misconduct alleged is not the mere existence of decentralized or imperfect files. Plaintiffs allege knowing use of that structure to impose and revive barriers while withholding the single definitive disposition necessary for compliance, occupancy, review, and sale.

321. The sworn evidence that officials possessed, exchanged, and could retrieve the operative information, while continuing to maintain external ambiguity, combines with the alleged private interest, retaliatory timing, express hostility, classification alteration, access denial, and contradictory permits to support deliberate injury rather than negligent administration alone.

**WHEREFORE**, Plaintiffs request judgment against the Borough of Apollo, Bureau Veritas North America, Inc., Brenda Troup, and Grant Kanish on Count V; compensatory and nominal damages; punitive damages against Troup, Kanish, and BVNA where legally permitted; appropriate prospective declaratory and injunctive relief; taxable costs; legally recoverable interest; and all other lawful and nonduplicative relief stated in the Prayer for Relief.

## COUNT VI - REGULATORY TAKING WITHOUT JUST COMPENSATION

42 U.S.C. § 1983 - Fifth and Fourteenth Amendments
Against the Borough of Apollo

322. Plaintiffs incorporate paragraphs 1–131, 134–155, 162–182, and 191–196 only to the extent relevant to this Count.

323. Plaintiffs' fee-simple ownership of 719 North Warren Avenue, including the rights to possess, use, improve, occupy, market, and alienate the parcel, constitutes the property interest supporting this

Count. The relevant parcel is 719 North Warren Avenue as a whole. Plaintiffs do not divide the MPAF, vacancy status, permit classifications, parking dispute, occupancy status, or later-condemned strip into separate regulatory parcels. *Murr v. Wisconsin*, 582 U.S. 383, 393–408 (2017).

324. A partial regulatory taking is evaluated by considering the economic impact upon the claimant, interference with reasonable investment-backed expectations, and the character of the governmental action. *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).

325. Plaintiffs do not allege a total categorical taking or that every permit error, procedural defect, delay, or violation of state law constitutes a taking. They allege a parcel-specific partial taking because Apollo made unresolved municipal approval a continuing condition of lawful commercial occupancy while withholding or failing to provide the definitive action necessary to complete the delegated permit and inspection process. Walker's later $155,000 offer confirms that residual value remained.

326. BVNA is not separately named as a Defendant in this Count. Its conduct is pleaded only as evidence of the operation, effect, and duration of Apollo's delegated municipal permitting structure and Apollo's maintenance, adoption, or ratification of that structure.

327. Until March 2022, Apollo made unresolved municipal approval a condition of lawful commercial occupancy while withholding the action necessary to complete the delegated permit process. After Apollo executed the MPAF, Apollo and its delegate allegedly continued the restraint by shifting or reviving parking, accessibility, use-allocation, classification, site, drawing, fee, and record issues without providing one stable permit, code-cited denial, or coherent path through inspection and occupancy.

### A. Nature and Duration

328. By May 7, 2020, Plaintiffs had retained an architect, submitted revised construction documents, responded to BVNA's technical review, and obtained DLI Accessibility Variance No. 538879. On that date, Kanish stated that BVNA possessed Plaintiffs' approved drawings and

accessibility variance and identified Apollo's signed MPAF as the "last piece of the puzzle" before permitting and inspections.

329. Through March 2022, BVNA conditioned permit action on unresolved Apollo MPAF signoff while issuing neither a stable approval nor a code-cited denial. After Apollo signed the MPAF, BVNA continued the process through additional or revived requirements without identifying one stable permit disposition, reviewed drawing set, or appealable Building Code Official action.

330. Apollo's eventual execution of the MPAF did not end the alleged restraint. After the signature, the process shifted to additional parking, accessibility, use-allocation, site, and drawing issues without producing a stable permit, a final code-cited denial, or an identified path from approved plans through inspection and occupancy.

331. In April 2023, Apollo offered to waive parking for Plaintiffs' pre-amendment application, and Apollo's counsel later acknowledged that there was "no problem" with the proposed commercial space. BVNA nevertheless referred to unidentified remaining defects, and no final permit disposition followed.

332. The renewed 2026 process likewise did not clearly terminate the alleged restraint. Apollo approved the municipal application with Troup's unexplained "Production appurtenant to primary retail use" notation. BVNA then produced M/S-1 and M/F-1 permit versions bearing the same permit number, project number, and March 2, 2026, issuance date, while taking inconsistent positions concerning whether the permit had issued.

333. Through at least June 2026, BVNA continued to characterize an unidentified version of Permit No. BVA26-040 as issued but unpaid, stated that the stamped drawings remained at Apollo, and stated that no additional reconciliation documents existed. Neither Apollo nor its delegate identified one controlling permit, one corresponding reviewed applicant drawing set, one classification, one set of conditions, one fee basis, or one reviewable disposition.

334. Plaintiffs therefore plead that, if the alleged restraint is found to constitute a compensable taking, the compensable period began no later than May 7, 2020, and continued through at least June 2026, subject to proof of the date upon which Apollo supplied a coherent operative permit record and removed the alleged parcel-wide restraint.

335. Plaintiffs plead Apollo's April 2017 commercial-use certificate, its referral of the Property into the BVNA change-of-occupancy process, and the governmental conduct occurring between April 2017 and May 7, 2020, as evidence of the origin and progressive operation of the alleged restraint, the reasonableness of Plaintiffs' investment-backed expectations, and the economic burden imposed upon the Property. May 7, 2020, is pleaded as the latest date by which Apollo's position had become sufficiently definite and injurious for purposes of the alleged taking claim.

**B. Economic Impact**

336. The economic impact is the effect of the alleged restraint upon the value and lawful use of the Property as a whole, not the amount of SloppySoap, Inc.'s anticipated profits and not an automatic reimbursement of every ownership expense.

337. Plaintiffs invested approximately $125,829 in acquisition and improvements and incurred approximately $33,358 in utilities and real-estate taxes while pursuing the intended commercial use. They also incurred mortgage interest, insurance, maintenance, professional, architectural, engineering, financing, and administrative expenses during the prolonged period of impaired use and disposition.

338. Those expenditures are pleaded as evidence of committed capital, duration, practical economic burden, and interference with expectations. They are not pleaded as automatic dollar-for-dollar just compensation.

339. The Property's unresolved occupancy and permit status also impaired its marketability. During active sale due diligence, Plaintiffs' realtor sought an official use determination from Apollo and communicated the resulting municipal uncertainties to the prospective purchasers.

340. Walker submitted a written $155,000 offer conditioned upon resolution of the Property's occupancy status. Plaintiffs countered at $175,000, and the transaction did not close. The offer confirms residual value but also supplies concrete market evidence that unresolved governmental status materially affected the Property's alienability and the terms upon which a purchaser was willing to proceed.

341. Plaintiffs will establish through transaction evidence, owner testimony, appraisal evidence, comparable-market evidence, and appropriate expert testimony the difference, if any, between the Property's value and use during the alleged restraint and its value and use with a coherent, lawful, and reviewable commercial occupancy disposition.

**C. Expectations**

342. Plaintiffs purchased a property that Apollo identified for commercial use through its April 2017 transfer certificate and referred into a separate UCC change-of-occupancy process. Apollo's Solicitor later acknowledged that Plaintiffs' proposed retail and production use appeared permitted, subject to the required change from assembly use.

343. Plaintiffs relied upon that regulatory posture by retaining professionals, preparing architectural drawings, obtaining the state accessibility variance, responding to technical review, submitting repeated applications and MPAFs, and addressing the matters identified by Apollo and BVNA.

344. Plaintiffs do not allege a reasonable expectation of receiving an unconditional permit, exemption from valid zoning or building-code requirements, free permit processing, or occupancy before completion of lawfully required work and inspection.

345. Plaintiffs allege a reasonable expectation that, after submission of the required materials and completion of the identified technical review, Apollo and its delegate would provide either approval or a written, code-cited denial under ascertainable standards within a reasonable and legally prescribed period.

346. Pennsylvania's statutory and regulatory framework required the Building Code Official, absent a written extension, to grant or deny the commercial permit application within the prescribed period, provide written and code-cited reasons for denial, mark the reviewed construction documents, identify required nondesign changes, and return a reviewed set. A permit applicant could appeal the Building Code Official's action on the application to a board of appeals. 35 P.S. § 7210.502(a); 34 Pa. Code § 403.43(a), (c), (i).

**D. Character**

347. The alleged restraint was not imposed through a generally applicable moratorium or comprehensive land-use program affecting a broad class of similarly situated parcels. It arose from Apollo's parcel-specific administration of vacancy status, municipal signoff, parking, records, permit custody, and its delegated UCC process concerning Plaintiffs' Property.

348. Apollo's own 809 North Warren Avenue project demonstrates that the Apollo-BVNA structure was capable of providing coordinated and definite action: Apollo signed its MPAF upon submission, BVNA issued a permit the following day, and temporary occupancy followed despite unresolved work.

349. The Parker former-church conversion likewise received one identifiable permit, stated occupancy classifications, a final inspection, and a Kanish-signed Certificate of Occupancy. Earthbound was permitted to continue operating while beginning a post-occupancy compliance process.

350. Plaintiffs do not contend that those properties were identical in every respect or that differential treatment independently proves a taking. They plead the comparator evidence as circumstantial support for the alleged parcel-specific and ad hoc character of Apollo's restraint and for the contention that administrative incapacity did not explain the absence of a definitive disposition.

351. Apollo concentrated the alleged burden upon Plaintiffs' parcel by maintaining an approval structure in which Apollo's unresolved action prevented BVNA's permit and inspection sequence, while the absence of BVNA occupancy approval was used to preserve Apollo's vacancy consequences and commercial-use restrictions.

**E. Finality**

352. A taking claim is final when the government has reached a definitive position causing concrete injury; exhaustion of every administrative procedure and repeated submission of materially identical applications are not required. Pakdel v. City and County of San Francisco, 594 U.S. 474, 478–80 (2021).

353. Plaintiffs allege de facto finality because, after repeated applications, Apollo's March 2022 MPAF signature, and the renewed 2026 process, Apollo and its delegate still identified neither a controlling permit and record nor any further administrative step capable of ending the restraint. Maintained nonresolution therefore became Apollo's operative position, not evidence of an open process.

354. Plaintiffs were not required to complete a separate Pennsylvania inverse-condemnation action before asserting this federal claim. *Knick v. Township of Scott*, 588 U.S. 180, 189–94 (2019) (overruling *Williamson County's* state-litigation requirement). Plaintiffs nevertheless remain bound by all applicable preclusion rules and may not obtain duplicate compensation for the same property interest, period, or injury.

**F. Just Compensation**

355. As a direct result of the alleged regulatory taking, Plaintiffs suffered a temporary or continuing diminution in the value and lawful use of the Property as a whole, together with impairment of marketability and alienability during the compensable period.

356. Plaintiffs seek just compensation measured through the legally appropriate and proven diminution in value, temporary loss of use, reasonable rental or use value, or other constitutionally permissible valuation method selected by the Court. If a taking is proven, its temporary duration does not eliminate the constitutional obligation to pay just compensation. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318–21 (1987).

357. Plaintiffs do not seek SloppySoap, Inc.'s lost profits, goodwill, or corporate business damages under this Count. Carrying costs, professional expenses, investment evidence, and the Walker transaction are pleaded as evidence of duration, impact, causation, expectations, and valuation, not as automatic or duplicative compensation.

**WHEREFORE,** Plaintiffs request judgment against the Borough of Apollo for just compensation, prejudgment and postjudgment interest as allowed by law, costs, and such other relief as the Court deems just and proper.

## COUNT VII - FORMAL PHYSICAL TAKING BY DECLARATION OF TAKING
## 42 U.S.C. § 1983 - Fifth and Fourteenth Amendments
## Against the Borough of Apollo

358. Plaintiffs incorporate paragraphs 1–40, 156–162, and 184–187 only to the extent relevant to this Count.

359. Count VII concerns the federal compensation shortfall from Apollo's November 1, 2023, Declaration of Taking. The later declaration, appraisal, payment, and compensation proceedings are supplemental events under Rule 15(d).

360. The Board of Viewers proceeding is stayed pending the Commonwealth Court appeal, and no final viewers' award or judicial compensation determination has been entered.

361. The approximately 479.5-square-foot acquisition overlaps the Cunningham Lane strip, fence-line area, and public-passage interest disputed in this action and therefore arises from the same core property dispute. *See T-Mobile Northeast LLC v. City of Wilmington*, 913 F.3d 311, 327–33 (3d Cir. 2019).

362. The state preliminary-objection ruling did not adjudicate compensation, so this Count neither complains of injury caused by that ruling nor seeks its review.

363. By filing the Declaration, Apollo appropriated identified private property and Plaintiffs' right to exclude for public use, effecting a physical taking requiring just compensation. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–52 (2021). Plaintiffs were not required to complete Pennsylvania compensation proceedings before asserting the federal claim. *Knick v. Township of Scott*, 588 U.S. 180, 192–94 (2019).

364. For a partial taking, Pennsylvania measures the whole property's value immediately before condemnation, unaffected by it, against the remainder's value immediately after, considering present use, reasonably available highest and best use, and admissible valuation evidence. 26 Pa.C.S. §§ 702(a), 703.

365. Apollo's appraiser viewed only the exterior and valued the condemned acreage at $275, expressly excluding fence-relocation costs. Apollo's later tender separately added $3,000 for fence relocation. Plaintiffs allege the appraisal and tender omitted compensable interests or effects on the remainder.

366. Apollo offered compensation in July 2024 and tendered $3,275 in April 2026, accepted only pro tanto. Acceptance did not waive final compensation or create an agreed valuation, release, or accord. 26 Pa.C.S. § 307(c)(1).

367. Plaintiffs accept the validity ruling and seek no reversal, return of the strip, revesting, or direction to a Pennsylvania tribunal.

368. The state preliminary-objection ruling addressed the validity of the taking, not the amount of compensation, which preliminary objections may not determine. 26 Pa.C.S. § 306(b). This Count therefore seeks only the unresolved federal compensation balance and does not seek review of the validity ruling. See *Merritts v. Richards*, 62 F.4th 764, 777–80 (3d Cir. 2023).

369. Ordinance 292-23 and the Declaration were official acts attributable to Apollo. Plaintiffs seek the unpaid balance of just compensation, constitutionally required delay compensation or interest, and other lawful nonduplicative relief, subject to dollar-for-dollar credit for amounts paid or finally awarded for the same property interest and injury and to the preclusive effect required by law.

**WHEREFORE,** Plaintiffs request the unpaid balance of just compensation, delay compensation, interest, and other lawful nonduplicative relief, subject to all credits and preclusion rules.

## COUNT VIII - ENTITY LIABILITY UNDER 42 U.S.C. § 1983

### Policy, Custom, Final-Policymaker Action, Delegation, Ratification, and Deliberate Indifference

### As to the Borough of Apollo and Bureau Veritas North America, Inc.

370. Plaintiffs incorporate paragraphs 1–155 and 162–196 only for entity liability on the underlying constitutional violations in Counts I–V.

371. The Borough of Apollo is liable under Monell because its final policymakers affirmatively created, maintained, and ratified an unwritten policy and custom of using fragmented, nonfinal record administration to block the commercial use of property while evading federal judicial review. Count VIII creates neither a separate violation nor separate damages. Apollo's theories apply to Counts I–V; BVNA's apply only to Counts I, II, III, and V because Count IV names Apollo alone.

372. Recoverable injuries are those in the underlying Count caused by the entity's policy, custom, final-policymaker decision, ratification, or deliberately indifferent structural omission.

373. Entity liability rests only on an entity's policy, custom, final-policymaker decision, ratification, or deliberately indifferent omission—not respondeat superior. *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978); *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 583–84 (3d Cir. 2003).

374. Apollo administered the UCC through BVNA while retaining zoning, vacancy, municipal approval, records, legislation, property decisions, and designation of the UCC appeal process.

375. Apollo treated the MPAF as a mandatory UCC gate without enacted standards, a deadline, written denial, or review. Same-day processing of its own MPAF shows municipal choice, not incapacity.

376. The divided-nonfinality structure recurred in 2026: Troup added an unexplained notation; Apollo held stamped drawings and competing permit materials; and Apollo issued no integrated decision identifying the notation's effect, controlling permit, drawings, or review.

377. Apollo administered vacancy selection without consistent criteria, formal tracking, or definite removal, burdening Plaintiffs but not the same structure under Shiloh.

378. Apollo allowed Troup to combine zoning, vacancy, signoff, records, compliance, and property functions while holding neighboring commercial property, without effective disclosure, recusal, reassignment, or neutral review after notice.

379. Council and responsible officials received notice through written objections, Council appearances, records proceedings, litigation, DLI communications, the September 2023 conference, Scott's January 2026 presentation, and the conflicting permit record. Apollo continued without procedures requiring timely written disposition, conflict review, or one coherent permit record.

380. Ratification is alleged only where a final policymaker knowingly approved, maintained, or continued a challenged decision or practice after notice of its facts and constitutional consequences.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

381. Deliberately indifferent omissions included no process ensuring written authority and conditions, timely approval or denial, one permit and reviewed set, conflict controls, or a Building Code Official action definite enough for review.

382. BVNA acted under color of state law through delegated UCC review, permitting, inspection, classification, and administration. Liability rests on its own practices, decisions, customs, and omissions.

383. BVNA conditioned permit action on unresolved MPAF signoff while issuing neither stable approval nor code-cited denial, and after May 2020 continued treating Apollo's inaction as blocking an appealable UCC result.

384. Smay changed the plans from F-1 to S-1; Kanish approved and created BVA26-040; BVNA later generated an M/F-1 version with the same identity; and counsel defended resolving document disputes only after payment.

385. After notice that competing permits shared the same number and date, BVNA billing still treated "the permit" as issued and unpaid. BVNA said drawings remained at Apollo and no reconciliation documents existed. No official identified a superseding permit, corrected issuance, or supplied one reviewed set.

386. BVNA assigned McMillen to Apollo inspection work although Kanish acknowledged that BVNA's local office lacked his requested CV or résumé. Apollo likewise possessed no employment, contract, appointment, or qualification records for him. No produced record established that McMillen was authorized or qualified to perform the particular Apollo inspections assigned to him.

387. Plaintiffs do not allege that the absence of credentials alone violated the Constitution. They plead BVNA's and Apollo's undocumented delegation of governmental inspection functions, failure

to maintain or produce qualification records after notice, and Kanish's enforcement proposal in response to the records request as evidence supporting the policies, customs, supervision failures, retaliation, and structural omissions alleged in this Count.

388. Apollo maintained a records structure in which active files remained in Troup's home office, contractor records remained with BVNA and Kanish, and official collections and productions were coordinated through Shupe and Andreassi-associated sources. After repeated OOR proceedings, litigation, and notice, Apollo still lacked a procedure requiring one coherent administrative record and final disposition.

389. The predictable consequence was repeatedly demonstrated: officials could rely on information held outside the public property file, represent that a production or search was complete, later disclose additional records, and continue changing or reviving requirements without issuing one appeal-triggering decision.

390. Apollo's failure after repeated notice to require centralized and verified collection, stable custody of the permit record, timely written dispositions, and one controlling permit and reviewed plan set supports the alleged deliberate indifference and ratification. BVNA's parallel failure to maintain and identify the operative UCC record supports its own entity liability on the underlying claims.

**WHEREFORE,** Plaintiffs request entity liability only for proven underlying violations caused by the policies, customs, decisions, ratification, or omissions alleged in Count VIII.

**COUNT IX - CIVIL-RIGHTS CONSPIRACY**
**42 U.S.C. § 1983**
**Against Brenda Troup, Grant Kanish, Cynthia McDermott, Deanna Shupe, Richard Craft, Scott Andreassi, and Mark Tarle**

391. Plaintiffs incorporate paragraphs 1–32, 40–155, 162–190, and 193–196 only to the extent relevant to this Count.

392. A conspiracy under 42 U.S.C. § 1983 requires an understanding to deprive a person of a constitutional right, an overt act in furtherance of that understanding, and an independently actionable constitutional injury. Plaintiffs infer a tacit understanding from specific communications, participant knowledge, sequencing, and complementary conduct, not merely from parallel governmental activity or the Defendants' professional relationships. *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178–79 (3d Cir. 2010); *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 293–96 (3d Cir. 2018).

393. The alleged shared objective was to preserve an unresolved administrative status that prevented lawful use of the Property while avoiding one definitive, reviewable determination. Apollo actors would leave municipal prerequisites unresolved, BVNA would treat those unresolved matters as preventing final UCC action, and the participants would substitute or revive barriers rather than issue a complete approval or code-cited denial.

394. Troup and McDermott knew that Apollo treated lawful operation as necessary to end vacancy status while BVNA treated Apollo approval and the vacancy process as prerequisites to lawful operation. After Plaintiffs challenged the vacancy designation in writing, Troup communicated with Kier concerning citation timing, McDermott continued the vacancy process, and citations issued while the written challenge remained unresolved. These facts support an inference of coordinated use of vacancy enforcement to preserve the administrative barrier.

395. Kanish and Andreassi coordinated the municipal and UCC positions. Andreassi characterized Plaintiffs' repeated MPAF request as a "back door" effort. Kanish stated that BVNA would not proceed until Apollo's occupancy and vacancy requirements were completed. Kanish later proposed going on "Offense" through citations because Plaintiffs were "always asking for documents" so that "maybe this could go away." Andreassi's related responses and continuing administrative coordination support an inference of shared knowledge, retaliatory motive, and knowing furtherance of the unresolved-status objective.

396. Craft attended the April 2019 meeting, reviewed the MPAF and parking issues, determined that Plaintiffs had sufficiently addressed parking, and concluded that no land-development plan was required. Craft told Troup that she could note zoning compliance, while stating that Kanish could "give them grief" concerning accessible parking. Troup responded, "I'll sign it now." Craft later stated that he required no additional information. Apollo nevertheless supplied neither the promised MPAF signature nor a written municipal denial, and Kanish continued treating the missing signature as the permit barrier. The unexplained sequence supports an inference of knowing complementary action rather than independent technical review.

397. Shupe participated through municipal-approval and records functions. She immediately signed Apollo's MPAF for its own 809 North Warren project while Plaintiffs' contemporaneous application remained unsigned and undenied. After an Andreassi-requested search, she later attested that no additional change-of-use ordinance or responsive records existed although Ordinance 271-16 had recently been filed in this action. Together with the later production of additional communications and contractor records, those facts support an inference that Shupe knowingly participated in the coordinated maintenance of an incomplete public administrative record.

398. The OOR and deposition record further shows that relevant information existed across Troup's home office, Apollo's files, BVNA and Kanish's records, Shupe's records searches, Craft-

related municipal files, and Andreassi-associated sources. The participants therefore possessed or could retrieve information needed to state the governing requirements and issue a final determination, yet continued to present the process externally as incomplete or unresolved.

399. Tarle furthered the alleged retaliation by imposing special conditions on Plaintiffs' access to Borough records, directing objections into the Andreassi-controlled administrative channel, and later ordering contractors to stop fence construction without a written violation, citation, or stop-work order. Troup was present, and Apollo thereafter demanded removal or relocation of the fence. The sequence supports an inference of coordinated implementation rather than an isolated personal opinion.

400. The alleged understanding continued through the later permit and property conduct. Troup communicated adverse municipal status during the Walker sale and added the unexplained 2026 use notation after Scott's Council criticism. Kanish approved the unexplained F-1-to-S-1 alteration, directed the initial permit-file access denial, and maintained competing permit tracks after notice. Those acts plausibly furthered the same objective of preserving unresolved status in response to Plaintiffs' continued speech and petitioning.

401. Count IX creates no freestanding constitutional violation and no duplicate damages. Liability exists only where an overt act caused an independently actionable violation established under Counts I, II, III, or V. Earlier conduct is actionable only if timely; otherwise it is pleaded as evidence of formation, knowledge, motive, agreement, and scope.

402. The Defendants' coordinated understanding and overt acts in furtherance thereof directly and proximately caused the independent constitutional deprivations alleged in Counts I, II, III, and V, inflicting severe ongoing carrying costs and lost transactional opportunities upon Plaintiffs.

403. As a direct and proximate result of the actionable overt acts, Plaintiffs suffered additional loss of use, administrative and professional expenses, carrying costs, impaired marketability and alienability, lost sale opportunity, diminished value or equity, and emotional distress.

**WHEREFORE**, Plaintiffs request judgment against the individual Defendants named in this Count, together with the lawful and nonduplicative relief stated in the Prayer for Relief.

**COUNT X - TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS**

Pennsylvania Common Law
Against Brenda Troup

404. Plaintiffs incorporate paragraphs 1–32, 130–131, 140–142, 150–152, 184–187, and 193–196 only to the extent relevant to this Count.

405. Pennsylvania requires a prospective contractual relation, purposeful interference, absence of privilege or justification, actual damage, and a reasonable likelihood the relation would have occurred but for interference. *Glenn v. Point Park College*, 441 Pa. 474, 480–84, 272 A.2d 895, 898–900 (1971); *Acumed LLC v. Advanced Surgical Services, Inc*., 561 F.3d 199, 212–15 (3d Cir. 2009).

406. Walker's April 24, 2025, offer was a concrete prospective contractual relationship, not a speculative hope. Walker expressly stated that the matters identified in the offer were the "details of how we came to this offer number" of $155,000. Those matters included alleged "CODE COMPLIANCE—Rear Deck," an asserted ADA and Borough-code issue, an easement issue requiring dealings with Borough officials and additional expenditures, uncertainty concerning Borough fire-code compliance, and an occupancy-permit contingency requiring the Property's status to conform to the current Business Transition zoning.

407. Troup's March 24, 2025, municipal communication preceded Walker's offer and addressed substantially corresponding subjects, including the Business Transition and Town Center Overlay

districts, a municipal prior-approval form, engineered drawings, alleged egress issues, the front-ramp variance, and her assertion that the rear exit remained unapproved. On information and belief, Weig-Tamasy communicated or summarized the municipal information to Walker during due diligence. The precise communications among Troup, Weig-Tamasy, and Walker are within those persons' knowledge.

408. Troup knew Apollo had issued the rear-deck permit and that no revocation, failed inspection, violation notice, stop-work order, or written denial declared the permitted work unlawful. She nevertheless stated categorically that the back deck was "definitely not approved," without disclosing the permit or limiting her statement to the absence of a final inspection or certificate.

409. Troup knew she was supplying official municipal information to the realtor for use in an active property listing and prospective-purchaser due diligence. Her categorical wording, omission of the permit, asserted interest in neighboring property, prior claim that Plaintiffs' proposed use affected her business, and knowledge that her statements would be transmitted in the sale process support a reasonable inference that she intended to burden or disrupt the prospective sale rather than neutrally report the municipal record.

410. Using materially incomplete or misleading municipal information to influence a private sale was not privileged or justified, particularly where the information was supplied outside an adjudicative proceeding and while Troup held an asserted neighboring interest. *Restatement (Second) of Torts* § 767; *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530–32 (3d Cir. 1998).

411. Plaintiffs do not attribute Walker's separate roof, retaining-wall, or structural concerns to Troup. Plaintiffs allege that Troup caused or materially intensified the distinct municipal, code, deck, egress, zoning, and occupancy risks that Walker expressly identified as part of the basis for the $155,000 offer and its contingencies. Plaintiffs countered at $175,000, but the transaction did not

close after the parties could not reach acceptable terms concerning price, risk, inspections, and expenditures. Without Troup's alleged interference, there was a reasonable probability that the negotiations would have continued toward a sale on materially more acceptable terms.

412. Plaintiffs allege that Troup used municipal information to advance a personal commercial interest and disrupt a private transaction, outside any legitimate municipal purpose or privilege. If proven, that intentional conduct constituted willful misconduct under 42 Pa.C.S. § 8550.

413. Troup's alleged interference caused actual pecuniary harm by burdening Walker's $155,000 offer and the ensuing negotiations with additional municipal, occupancy, code, rear-deck, egress, zoning, and permit risks and contingencies; impairing Plaintiffs' bargaining position and the Property's marketability; and causing additional carrying costs after the transaction failed. Plaintiffs further allege that, absent the interference, there was a reasonable probability that the negotiations would have produced a sale on materially more favorable terms.

**WHEREFORE,** Plaintiffs request judgment on Count X and the applicable relief stated below.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Janet L. Brunermer and Robert Scott Brunermer request judgment against the Defendants found liable and:

A. Award compensatory and nominal damages against the applicable Defendants on each proven Count, except where unavailable by law;

B. Award punitive damages against the individual Defendants and Bureau Veritas North America, Inc., where legally permitted, but not against the Borough of Apollo;

C. Award just compensation for any proven temporary or continuing regulatory taking under Count VI and the unpaid balance proven under Count VII, with recoverable delay

compensation and interest, crediting the $3,275 paid and any later payment or award for the same interest, period, and injury;

D. Enter prospective declaratory and injunctive relief, without reopening or invalidating any state judgment or conviction, barring renewed registration, inspection, fee, citation, or penalty enforcement against the Property under Ordinance 282-21 or a materially identical successor unless Apollo provides written notice identifying the operative category, factual trigger, vacancy period, nuisance basis, waiver and removal criteria, and review procedure;

E. Enter prospective relief requiring Apollo and BVNA, to the extent each has present authority, custody, or control, to identify and provide one complete, internally consistent operative permit record, including the controlling permit, reviewed applicant drawing set, classifications, conditions, governing code edition, fee basis, inspection requirements, and review procedure, without this Court selecting the substantive zoning or UCC result in the first instance;

F. Award taxable costs and reasonable attorney's fees incurred through retained counsel, if any, to the extent recoverable under 42 U.S.C. § 1988 or other law;

G. Apply all required credits, offsets, preclusion rules, and limitations while preserving recovery for distinct injuries not previously adjudicated or compensated; and

H. Grant other just and proper relief.

## VII. JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

**Respectfully submitted**,

/s/ Janet L. Brunermer
Janet L. Brunermer, Pro Se
719 North Warren Avenue
Apollo, PA 15613

/s/ Robert Scott Brunermer
Robert Scott Brunermer, Pro Se
514 Hoover Drive
Apollo, PA 15613

sloppysoap@sloppysoap.com
724-506-2895

sloppysoap@windstream.net
724-624-2716

July 30, 2026

**CERTIFICATE OF SERVICE**

We certify that on July 30, 2026, we filed this Third Amended Complaint through the Court's CM/ECF system. The system transmitted a Notice of Electronic Filing to all registered counsel of record, constituting service under Federal Rule of Civil Procedure 5 and § 12.2.1 of the Western District of Pennsylvania Electronic Case Filing Policies and Procedures.

/s/ Janet L. Brunermer
Janet L. Brunermer, Pro Se
719 North Warren Avenue
Apollo, PA 15613
sloppysoap@sloppysoap.com
724-506-2895

/s/ Robert Scott Brunermer
Robert Scott Brunermer, Pro Se
514 Hoover Drive
Apollo, PA 15613
sloppysoap@windstream.net
724-624-2716

July 30, 2026