EXCERPTS

EXHIBIT 12

exhibitsticker.com



- - - -

IN THE COURT OF COMMON PLEAS

OF ARMSTRONG COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| JANET and SCOTT BRUNERMER, | ) | |
| Plaintiffs, | ) | No. 2019-01343-CIVIL |
| vs. | ) | No. 2019-01402-CIVIL |
| APOLLO BOROUGH, | ) | No. 2019-1508-CIVIL |
| Defendant. | ) | No. 2019-01790-CIVIL |

**DEPOSITION OF BRENDA TROUP,**

taken pursuant to the Pennsylvania Rules of Civil Procedure, before Lisa Ann Bauer, Certified Realtime Reporter-Notary Public in and for the Commonwealth of Pennsylvania, on Friday, December 13, 2019, at the offices of Soldiers & Sailors Hall, Owens Grove Park, Park Avenue and N. 2nd Street, Apollo, Pennsylvania 15613, scheduled to commence at 8:30 o'clock a.m.

- - -

in -- when there is inspections, I probably put in 30 hours a week.

**Q.** So it just depends on how many zoning or other inspections need to be done. That's what determines how much or little you work?

**A.** Yes.

**Q.** And then I'm going to hand you what our court reporter will mark as Exhibit 1.

(Troup Deposition Exhibit 1 was marked for identification.)

**BY MR. GORDON:**

**Q.** And just so the record is clear, this is a document from the Office of Open Records that shows -- when you look up the Apollo Borough, it says that the Agency Open Records Officer is Deanna Shupe.

Does that appear to be the document I've handed you?

**A.** I see that, yes.

**Q.** Do you know if, in fact, Deanna Shupe is the borough's Open Records Officer for purposes of the Right-to-Know Law?

**A.** I have not been told that directly. I don't know -- I'm not sure.

**Q.** And have you, at any time since working for the borough from 2012, known who the borough's Open Records

- - - -

Officer is?

**A.** No.

**Q.** Does Apollo Borough have a policy that guides you on how long you're supposed to keep records? Sometimes they are called a record retention policy.

**A.** They may have. I've not read it. I've not seen it.

**Q.** Has anyone trained you on it or said, here, read this, or anything like that for the record retention policy?

**A.** No.

**Q.** When you're doing work for Apollo Borough and you create a document or an email or something like that, is there some specific way that you file that or save it with the borough?

**A.** It is saved in my personal records until the case is closed, and then it is turned over to the office.

**Q.** And what do you mean by "the office"?

**A.** The Apollo Borough office.

**Q.** And so, some of -- I'm just trying to understand, when you say when you're working on a case, are you personally in possession of the documents?

**A.** Yes, I am.

**Q.** And where do you store them?

**A.** In my home office.
**Q.** And then when that particular matter wraps up, then you turn those files in to the borough?
**A.** Yes.
**Q.** Do you happen to know what the borough does with those files after you turn them in?
**A.** They, in turn, file them in their records according to what matter it has been open.
**Q.** Do you know how long the borough keeps those files?
**A.** From my understanding, they don't dispose of records.
**Q.** And what would happen -- let's say you have turned in a file in the borough and now, for whatever reason, you want to look back at something you previously did. Could you go back and find that record at the borough, then?
**A.** Yes.
**Q.** Have you ever done anything like that before?
**A.** In relation to certain zoning topics, yes, several times.
**Q.** So you think you're done with a case, you turn your file in, and then down the road, something comes up, makes you think I want to look at what I did after I turned it in, and you go to the borough and you

find it?

**A.** Yes.

**Q.** And so, I'm sure you're aware that the four cases we are here today on are enforcement cases under the Right-to-Know Law. So what I'm going to do with you is just go through some of the requests that have been filed under the Right-to-Know Law in these four cases and just sort of see to the extent you know about these requests and what there is and just go from there.

But maybe before we do that, there are going to be some just general or documents that we're going to refer to a bunch, because they sort of apply to all of them, so the first I'm going to hand you is -- and we'll mark this Exhibit 2.

(Troup Deposition Exhibit 2 was marked for identification.)

**BY MR. GORDON:**

**Q.** So, this is an August 22, 2019, letter and it is written by the borough's solicitor, Mr. Andreassi.

Does that appear to be the document I've handed you?

**A.** Yes.

**Q.** Have you reviewed this document or seen this letter before today?

- - - -

**A.** Give me just a moment, please. (Witness reviews document.)

Yes, I've seen this document.

**Q.** And what was your understanding as the reason this document was created or sent to Scott and Janet Brunermer?

**A.** It appears that it is a response to a Right-to-Know request.

**Q.** And did you help gather information for the borough to respond to the request in this letter?

**A.** Yes.

**Q.** And then the next thing I'll hand you, did you attend a hearing on June -- I think it was 24th, 2019? I think it was a summary appeal hearing involving Janet Brunermer regarding the borough's vacancy ordinance.

Does that sound familiar?

**A.** Yes.

**Q.** I'm going to hand you what the court reporter will mark as Exhibit 3.

(Troup Deposition Exhibit 3 was marked for identification.)

**BY MR. GORDON:**

**Q.** Do these appear to be the exhibits that were offered at that hearing?

form or if I had seen it in a typewritten form, but I have seen this request.

**Q.** So, if you turn back to Exhibit 5, which is the final determination by the Office of Open Records, you'll see on the first page there is the number 1, 2, and 3.

Do you see where I'm looking at?

**A.** Yes.

**Q.** Those are the Office of Open Records summarizing the three requests we just looked at.

Would you agree with that?

**A.** Yes.

**Q.** And then I'm going to turn your attention, then, back to Exhibit 2, and then look at -- it's on the second page -- No. 4, and then we'll look at 4a. first.

So, you see where it says "723 North Warren Property"?

**A.** Yes.

**Q.** Did you help find information related to 723 North Warren Avenue to assist the borough in responding to this request?

**A.** Yes.

**Q.** And what did you do to gather information to respond to this request?

**A.** I reviewed the records pertaining to this request and offered them for review to our solicitor.

**Q.** And what records would those have been that you found?

**A.** My inspection reports for that property.

**Q.** And, I guess, how many pages would that inspection report have been?

**A.** One.

**Q.** And would there have been anything else that you would have looked at to help gather information responsive to this request?

**A.** No.

**Q.** Can you recall sending any letters to the property owner regarding 723 North Warren?

**A.** Personally, I do not generate those letters.

**Q.** Did you review any letters that anyone else at the borough had sent to this property?

**A.** I review a general letter that's sent to all of the property owners. This is in reference to 2018, correct? It says --

**Q.** Well, the request said -- let's look at it.

**A.** 4a.iii. It says that this is October 9th. I think that's for 2018, and it says the property will be due for inspection October 2019. I did review those particular letters as I sign off on them.

have the waiver requests submitted by 723 North Warren?

**A.** Yes.

**Q.** And then I'll direct your attention, then, to Exhibit 3, and then it is the third page labeled Commonwealth Exhibit 3. It's a January 18, 2018, letter to Scott and Janet Brunermer.

Have you seen this letter before?

**A.** Yes.

**Q.** And would the borough, to your knowledge, have sent any other letters to the Brunermers in January of 2018 other than this letter?

**A.** Not to my knowledge.

**Q.** And then you'll see, going back to Exhibit 2 and staying with No. 4 on that page, but going down to subparagraph c., you'll see it says "All 'files' related to the Requester's property," meaning the Brunermers' property, "located at 719 North Warren Avenue have been provided to the Requesters or the Requester's attorney as part of the litigation noted in subparagraph b. above or in response to Requester's Right-to-Know requests."

And if you look up to b. above, it appears to just mention the exhibits at that hearing we talked about and that we were looking at that's Exhibit 3.

Does that sound correct to you?

- - - -

**A.** Yes.
**Q.** And then this letter sent by the borough's solicitor also has some files and documents that are responding to the various Right-to-Know Law requests?
**A.** Are you referring back -- which exhibit are you --
**Q.** Exhibit 2. I'll try my best to keep everybody aware of what we're looking at. I apologize. It's a lot.
So, if you look, Exhibit 2, the letter is maybe four pages, and then after that, there are, it looks like, Exhibits A through F attached to that letter.
**A.** Yes.
**Q.** So, turning back to 4c. of this letter that's Exhibit 2, to the best of your knowledge, are the court exhibits that we just went over that are Exhibit 3 and then the exhibits to this letter, is that all the documents that are referenced here that all files related to the property have been provided?
**A.** Provided to the Brunermers?
**Q.** Correct.
**A.** Regarding 719?
**Q.** Right.
**A.** Yes.

- - - -

**Q.** Can you think of -- outside what was attached to this August 22nd, 2019, letter and the court exhibits that are Deposition Exhibit 3, can you think of any other records that the borough has submitted or sent to the Brunermers saying this is a further response or further responsive documents to your request?

**A.** No, I can't think of any other necessary -- well, any other documents that would be...

**Q.** I'm not trying to trick you. I'm just trying to make sure that we're all operating in the same universe of what -- that I didn't miss a letter or something else.

So, keep the first couple exhibits handy, but we're going to move on to the next set of documents. So, what we're marking as 9 is an --

(Troup Deposition Exhibit 9 was marked for identification.)

**BY MR. GORDON:**

**Q.** Exhibit 9 is a final determination issued by the Office of Open Records on August 2nd, 2019, and it covers -- if you look at footnote 2 on page 2, it's saying it's talking about OOR dockets AP 2019-1103 and AP 2019-1114.

**A.** Yes.

of it.

**Q.** And then, are you familiar with Shiloh Baptist Church?

**A.** Yes.

**Q.** And am I correct that that church was located at 719 North Warren Avenue in Apollo Borough?

**A.** Yes.

**Q.** And that's the building that the Brunermers purchased a few years ago?

**A.** Yes, it is.

**Q.** And then, if you look at -- well, before you look anywhere, do you remember, was that church vacant under the borough's vacancy ordinances when the Brunermers purchased that church?

**A.** Yes, it was.

**Q.** And so, just help me understand. When the borough determines a building is vacant, what does the -- it sounds like we're talking about there are inspections done every year; is that right?

**A.** Yes.

**Q.** And, to your knowledge, did you do any vacancy inspections for the Shiloh Baptist Church?

**A.** No, I did not.

**Q.** You didn't. Okay. And do you recall why you wouldn't have done an inspection?

**A.** I do recall.

**Q.** And what was the reason you didn't do an inspection?

**A.** When the church was suspected vacant, a little bit of investigating was done. I had asked the property owner at that time -- or a representative, I'm sorry, not the owner -- if they were conducting as a church, and she advised me at that time that they were not and that they were looking for a buyer. At that time, we -- we, meaning Cindee McDermott and I -- discussed that it would have to come onto the vacancy list.

So, within the period of coming due for inspections and the time that the Brunermers bought that building, since the ownership had transferred hands, the clock begins ticking again. If you have familiarized yourself with our vacancy ordinance, it allows for a period of six months. So, rather than go from the date where we suspected or confirmed that it was vacant and go out that six months to start the inspection, we allotted the Brunermers from the point where they bought it in April another six months.

**Q.** Did Shiloh Baptist Church ever turn in any vacancy registration paperwork or anything like that?

**A.** No, because they would not have been the owners

at the time that the vacancy waivers -- the packet that's sent to the property owners, Shiloh Baptist would have never received that. Those are generated in late June to early July, which, at that time, the Brunermers were now the owners.

**Q.** Okay. So, I think I understand what you're saying, but I just want to rephrase it so that I know we're on the same page.

**A.** Yes.

**Q.** So, it sounds like at some point in, we'll say, early 2017, you and Miss McDermott come to a conclusion that Shiloh Baptist Church is vacant. Is that correct, so far?

**A.** It was more like late 2016.

**Q.** And so, would the church have been added to the vacancy list at that time?

**A.** Yes. Not added to the list that we reviewed, but it was on the table as needing to be included.

**Q.** So it might not have been added to some sort of formal list, but just the borough somehow made a note that the next time we do vacancy, we need to include the Shiloh Baptist Church?

**A.** Yes.

**Q.** And so, to your knowledge, did Shiloh Baptist Church ever pay a fine under the vacancy ordinance?

**A.** No, they did not.

**Q.** Did they ever get a citation or anything like that under the vacancy ordinance?

**A.** No, they did not.

**Q.** Did they get any letters or any paperwork under the vacancy ordinance?

**A.** No, they did not.

**Q.** And do you recall how the borough keeps track of which properties aren't on the official vacancy list but need to be added for the next year? How do you make sure you don't forget, hey, in 2017, we've got to make sure we include Shiloh Baptist Church? How did it work?

**A.** Well, I could -- I could probably answer that particular circumstance better had Shiloh actually ended up being included on that list. There are several properties along Warren Avenue that have been vacant, so it's not one that would have been forgotten.

**Q.** So, from what I'm understanding is there maybe wasn't a formal way or there is not, like, some sort of informal list that the borough keeps saying these are new properties we suspect. It's just sort of your and other borough employees' knowledge and memory that, oh, yeah, we learned there are some more vacant properties on this street or that street. Next time we do it,

we've got to remember to include them?

**A.** Yes. The only official written item that we can refer to in suspecting that a property is vacant is a water usage report. When it says that there has been zero water usage, that kind of alerts us that, hey, there is nothing going on there.

**Q.** And is that what triggered it for the Shiloh Baptist Church?

**A.** No.

**Q.** It was that conversation?

**A.** No. It was inactivity. It was me inquiring. It was, you know, honesty on the behalf of the representative at that time.

**Q.** And then, we sort of talked about it, but I'll just direct your attention back to Exhibit 9. And No 6 says the sixth category of that request was a copy of the vacancy inspection checklist for 2016, 2017, and 2018, and I just want to -- and then going back to Exhibit 2 and Exhibit A to Exhibit 2 --

**A.** It's the inspection checklist, correct?

**Q.** There is no other -- I just want to make sure that there is no other document. Since 2016 through 2018, this would have been the only checklist that you would have used?

**A.** This is the only checklist, yes. It is meant

- - - -

**A.** I can't answer that. I'm not part of the rental inspection process.

**Q.** And I think we covered this, but just to be clear, does the borough have its own change of use requirements, to your knowledge?

**A.** No. The requirements are what Veritas's requirements are for UCC compliance. That is all.

**Q.** And have you ever seen Mr. McMillen's résumé or CV or anything like that showing his education and professional experience?

**A.** No.

**Q.** Have you ever asked for that?

**A.** No.

(Troup Deposition Exhibit 19 was marked for identification.)

**BY MR. GORDON:**

**Q.** So, I've handed you what we've marked as Exhibit 19. This is a Complaint in Mandamus that the Brunermers instructed me to file against Apollo Borough regarding some additional Right-to-Know Law requests.

To your knowledge, have you seen this complaint before?

**A.** No, I have not.

**Q.** And then, there is a couple more Right-to-Know Law requests of things in here, and they are all

2019, letter from the Office of Open Records again to the Mayor of the Borough of Apollo.

Have you seen this letter before?

**A.** No, I have not.

**Q.** Then I just have a few quick final questions and, hopefully, I can get you on your way.

So, we'll go back. Have you ever seen a temporary certificate of use and occupancy, dated April 5, 2017, related to 719 North Warren Avenue?

**A.** Yes.

**Q.** And when did you come to see that document?

**A.** I saw the document on the day that we held an informational meeting with the Brunermers' second, third -- third lawyer, I believe it was. Grant Kanish had produced that and I saw it on his phone.

**Q.** And do you recall when this meeting was?

**A.** I do not.

**Q.** And Grant Kanish, what's his role again, briefly, for the borough?

**A.** His role is to ensure UCC compliance.

**Q.** On behalf of Apollo Borough?

**A.** Yes.

**Q.** In response to any of these Right-to-Know Law requests, have you personally asked Mr. Kanish for any documents or to see if he has any documents?

**A.** I may have. There has been discussion between Grant Kanish and I regarding some of the requests to ensure that there was no additional information available.

**Q.** And in those discussions, did you ask for that temporary certificate of use and occupancy?

**A.** No. My only encounter with that was just seeing that on his phone.

**Q.** And then, I think we've covered this, but I just want to be real clear so that the record is just -- everybody is on the same page.

For Shiloh Baptist Church at 719 North Warren Avenue, did they ever send in a request to not have to pay the vacancy fees?

**A.** No. They never sent in a request for waiver.

**Q.** And would the borough have ever sent a letter scheduling a vacancy inspection for Shiloh Baptist Church?

**A.** No, they would not have.

**Q.** And did Shiloh Baptist Church ever send in the registration paperwork under the vacancy ordinance?

**A.** No.

**Q.** And just real quick, you sound very confident in that, and I just want to understand how do you know that those -- I'm not doubting you. I'm just trying to

understand how did you come to know that Shiloh Baptist Church never did any of those things?

**A.** It was a matter of timing in the purchase of the building. Since the Brunermers purchased the building in April of 2017, the letters would have been generated later that year, either in June or July, and then the vacancy process would have followed through from there. They were not involved at the time that the letters were being generated.

**Q.** Were you involved with the borough deciding to become opt-in with the Department of Labor and Industry?

**A.** No, I was not.

**Q.** Have you seen any letters or meeting minutes in the borough's offices related to that?

**A.** No.

**Q.** Have you seen any documents that the Department of Labor and Industry might have sent Apollo Borough regarding 719 North Warren Avenue?

**A.** No.

**Q.** Did anyone ask you to look for those two categories of documents?

**A.** No.

MR. GORDON: Let me just look real quick, but I think -- I think that is everything I have for

C E R T I F I C A T I O N

I hereby certify pursuant to Pa.R.C.P. No. 4017(d) that the witness, **BRENDA TROUP**, was duly sworn by me and that the foregoing deposition is a true record of the testimony of the witness.

The foregoing certification does not apply to any reproduction of this transcript in any respect unless under the direct control and/or direction of the certifying reporter.

Lisa Ann Bauer

Lisa Ann Bauer, Notary Public
in and for the Commonwealth
of Pennsylvania

Commonwealth of Pennsylvania - Notary Seal
Lisa Ann Bauer, Notary Public
Allegheny County
My commission expires April 13, 2023
Commission number 1008093
Member, Pennsylvania Association of Notaries

My Commission expires April 13, 2023.